**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
(at Cincinnati)**

| | |
|---|---|
| **M&C HOLDINGS DELAWARE PARTNERSHIP**, et al., | Case No. 1:20-cv-00121-SJD-KLL |
| Plaintiffs, | Judge Susan J. Dlott |
| v. | Magistrate Judge Karen L. Litkovitz |
| **GREAT AMERICAN INSURANCE COMPANY**, | |
| Defendant. | |

---

**DECLARATION OF DANIEL LEBERSFELD**

---

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.     I am an attorney with the law firm of Franzblau Dratch, P.C., counsel for defendant Great American Insurance Company ("GAIC") in the above-captioned action, and am admitted to appear in this action on a *pro hac vice* basis.  I respectfully submit this declaration in support of GAIC's motion to dismiss the Complaint herein.

2.     Attached hereto as Exhibit A is a copy of the Proof of Loss of M&C Holdings Delaware Partnership with exhibits omitted.  The Proof of Loss is referenced in the Complaint at paragraph 27.

3.     Attached hereto as Exhibit B is a copy of a claim notification letter dated June 23, 2017 from Amanda Roxland of Aon, and which is referenced in the Complaint at paragraph 27.

4.     Attached hereto as Exhibit C is a copy of a publicly available company fact sheet for Aon.

5.      Attached hereto as Exhibit D is a copy of a letter authored by Daniel Dorfman, counsel for the plaintiffs herein, dated November 19, 2019, which describes the investigation referenced in paragraphs 28 to 29 of the Complaint.

6.      Attached hereto as Exhibit E is a copy of an email dated October 10, 2019 from Adam Furmansky of Aon that appears to convey a message from Daniel Dorfrman, counsel for the plaintiffs herein.

7.      Attached hereto as Exhibit F is a copy of a letter from Stephen N. Dratch, counsel for GAIC, dated December 17, 2019 and which is referenced in the Complaint at paragraph 41.

8.      Attached hereto as Exhibit G is a copy of an email from Daniel Dorfman, counsel for plaintiffs herein, dated January 21, 2019 with attachment omitted.

9.      Attached hereto as Exhibit H is a copy of a letter from Stephen N. Dratch, counsel for GAIC, dated January 31, 2010, and which is referenced in the Complaint at paragraph 47.

10.      I declare under penalty of perjury that foregoing is true and correct to the best of my knowledge.

Executed on this 31st day of March 2020.


                                        */s/ Daniel Lebersfeld*_____
                                        Daniel Lebersfeld

2

# Proof of Loss – Fidelity

*Exhibit A*



To: <u>Great American Insurance Company</u>

(Name of Insurance Company)

Under your Policy No. <u>SAA 524-50-01-13-00</u> issued to <u>M&C Holdings Delaware Partnership</u>

(Insured)

(I or We) <u>M&C Holdings Delaware Partnership</u> hereby make claim for Loss of <u>$1,954,329,</u> occurring through the dishonesty of <u>Wayne Merdis</u> employed as <u>Reservation Manager and Corporate Revenue Manager</u> from <u>April 5, 1993</u> to <u>June 22, 2017,</u> said loss occurring between <u>May 18, 2001</u> and <u>April 20, 2017,</u> and discovered in <u>June 2017.</u> The said loss occurred as set forth in the statement on reverse side.

## Detailed Statement of Claim

| DATE | DESCRIPTION OF ITEMS CLAIMED | AMOUNT | | TOTAL | |
|---|---|---|---|---|---|
| Explanation and Schedule of items may be attached and made part | **\*Total Loss**.................................> | $1,954,329 | | | |
| | **Credits:**...................................> | 0 | | | |
| | Salary............................> | | | | |
| | Commission.....................> | | | | |
| | Any Other.........................> | | | | |
| | **Total Credits**...........................> | 0 | | | |
| | **NET LOSS**..................> | | | **$1,954,329** | |
| | *Total losses known to date. | | | | |

County of Denver §
§
State of Colorado §

<u>David M. Kolar,</u> being duly sworn according to law, deposes and says that he/she is <u>Vice President</u> (Position) of <u>M&C Holdings Delaware Partnership,</u> that the above Statement of Claim is true and correct, that the moneys set opposite the several items listed therein were misappropriated by <u>Wayne Merdis</u> on the dates and in the respective amounts set forth, that said moneys, and/or moneys realized from the proceeds of the goods not exceeding their cost value as set forth in said Statement, have not been paid over or returned in any way whatever to the said employer except as herein stated, that due and legal demand has been made by the said employer upon the said employee for the moneys or property above described, and that same have been fraudulently misappropriated by the said employee to his own use and benefit with the intent to deprive the said employer of said moneys or property.

That all items as set forth above are correct and that there has been no settlement made with the employee for any default covered by the Policy, except as follows:    None

1/3

If other security, indemnity or surety against said loss is held, list the amounts, names and addresses of the indemnitors or sureties with full description of same.  None

_____

_____

Further, that there are no offsets whatever against said claim for salary, commissions, etc., other than as set forth particularly on the above Statement, and that the said employer has fully complied with all the conditions of the policy issued by the <u>Great American Insurance Company</u> on behalf of the said employee.

And, further, that the said employee has been continuously in the employ of the said employer or its predecessor for the period beginning April 5, 1993 and ending June 22, 2017, the employment having been discontinued by reason of <u>Criminal prosecution for Grand Larceny and Falsifying Business Records</u>.

**SWORN** to and subscribed                    §

before me this ___ **28** ___ day of          §

___ *August* ___, A.D. ___ **2018** ___      §

_____          _____
                          Notary Public                         (Signature of Deponent)

David M. Kolar
Vice President

STEVEN ZAUGG
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20034009024
MY COMMISSION EXPIRES 03/14/2019

2/3

## BRIEF STATEMENT AS TO MANNER OF MISAPPROPRIATION

Mr. Wayne Merdis made and caused false entries in the business records of an enterprise, with the intent to defraud M&C Holdings Delaware Partnership for about 16 years.

Mr. Merdis had formed several fake travel agencies and, from 2001 to 2017, he fraudulently attached reservations to his agencies to receive commissions on those reservations. Those commissions were paid by Millennium Hotels and Resorts through TACS NTT Data Services and records of those payments are included in this claim.

Mr. Merdis admitted to the embezzlement when questioned during his exit interview. Present during that verb confession were our corporate VP of Talent and Culture, VP of Finance and VP of Legal Affairs, Associate General Counsel.

M&C Holdings Delaware Partnership, dba Millennium Hotel One UN Plaza, New York, promptly reported the case to the New York City District Attorney in 2017. Mr. Merdis was indicted for Grand Larceny and Falsifying Business Records, both in the First Degree.

M&C Holdings Delaware Partnership
_____
David M. Koler
Vice President                                        (Name of Claimant)

## INSTRUCTIONS FOR MAKING PROOF

Statement of loss should be an itemized account showing the names, dates, amounts and description of individual items, money, securities or property, misappropriated, stolen or embezzled, as nearly as can be ascertained, and if representing collections made, the dates, names and addresses of the persons, firms or corporations from which the collections were made.

Credits should be similarly entered in detail, as to commissions or salary due and unpaid and any securities, notes, etc., should be listed individually with full description.

Attach to proof all original vouchers, if possible, otherwise verified copies of same and any further evidence in explanation or support of the amount or amounts for which claim is made.

3/3

*Exhibit B*



**Amanda Roxland | Senior Claims Advocate & Team Leader | Amanda.Roxland@aon.com**

June 23, 2017

Via Email (crimeclaims@gaic.com)
Fidelity & Crime Claim Dept.
Great American Insurance Co.
One Waterside Crossing
Windsor, CT 06095

**RE:     Insured: M&C Holdings Delaware Partnership; CDL Hotels USA, Inc; M&C Hotel**
**          Interests Inc; M&C Management Services (USA), Inc. & Subsidiaries**
**          Coverage: Commercial Crime Policy**
**          Policy Number: SAA 524-50-01-13-00**
**          Policy Period: May 31, 2017 to May 31, 2018**
**          Matter: Theft - Hilton**

Dear Claims Manager:

On behalf of M&C Holdings Delaware Partnership, and all other Insureds (collectively the "Insureds"), and in accordance with the reporting provisions of the Policy, we hereby report to you a situation that may give rise to a Loss under the referenced policy.

The Insured has discovered numerous fraudulent payments which to date have resulted in an employee theft of approximately $1.8M.

We will provide additional details concerning this loss as they become available. We would appreciate a written acknowledgement and either your proof of loss form or related requirements within fifteen days following the date of this letter.

Please acknowledge receipt of this Claim at your earliest convenience, and direct all correspondence to the undersigned and: Janlyn Mahlman, (303) 779-2035, janlyn.mahlman@milleniumhotels.com. In addition, courtesy copies of all correspondence should be sent to Will.Kier@aon.com.

On behalf of the Insured, we reserve all rights under the Policy and at law with respect to this matter. Should you need any additional information, or if we can be of further assistance, please do not hesitate to contact the undersigned.

Sincerely,

Amanda Roxland
Senior Claims Advocate & Team Leader

Enclosures (Via Email)

June 23, 2017
Page 2 of 2

cc:     Janlyn Mahlman, Millenium Hotels, janlyn.mahlman@milleniumhotels.com
        Will Kier, Aon FSG, will.kier@aon.com

# Fact Sheet

*Exhibit C*

Aon plc (NYSE:AON) is a leading global professional services firm providing a broad range of risk, retirement and health solutions. Our 50,000 colleagues in 120 countries empower results for clients by using proprietary data and analytics to deliver insights that reduce volatility and improve performance.



**ENABLED BY**

### Aon Functional Leaders

**Greg Case,** Chief Executive Officer
**Christa Davies,** Chief Financial Officer
**Eric Andersen,** Co-President
**Mike O'Connor,** Co-President
**John Bruno,** Chief Operations Officer
**Siobhan Cifelli,** Chief Human Resources Officer
**Tony Goland,** Chief Innovation Officer
**Darren Zeidel,** General Counsel
**Andy Weitz,** Chief Marketing Officer

### Aon Solution Leaders

*Commercial Risk Solutions*
**Lambros Lambrou,** Chief Executive Officer

*Reinsurance Solutions*
**Andy Marcell,** Chief Executive Officer

*Retirement Solutions*
**Cary Grace,** Chief Executive Officer

*Health Solutions*
**John Zern,** Chief Executive Officer

*Data & Analytic Services*
**John Bruno,** Chief Executive Officer

## 2018 Total Revenue by Geography



APAC 11%
EMEA 22%
UK 15%
Americas - non U.S. 9%
U.S. 43%

## 2018 Total Revenue by Line



Data & Analytics 10%
Health 15%
Retirement 17%
Reinsurance 15%
Commercial Risk 43%

# One Portfolio of Solutions

*supported by*
**ONE OPERATING MODEL**

### Commercial Risk Solutions
- #1 primary insurance brokerage
- +$60B bound premium annually
- +90% average retention

### Reinsurance Solutions
- #1 treaty and facultative brokerage
- +$35B bound premium annually
- +30 consecutive quarters of net new business in core treaty

### Retirement Solutions
- $3.278T total global assets under advisement and management[1]
- Valuing approximately $3T in liabilities globally[2]
- #1 provider of Rewards solutions[3]

### Health Solutions
- Over 4 million Voluntary Benefits participants
- Leading provider of global health & benefits
- $180B in premium and equivalents placed globally

### Data & Analytic Services
- $400M annual investment in data and analytics
- Approximately $318B bound premium through the Risk/View for Carriers tool for Aon Inpoint clients
- +34M individual customers from +300 organizations served by Aon's US Affinity business

[1] As 6/30/18, total global assets represents $160B in discretionary assets under management and $3,118B in non-discretionary assets advised by AHIC and its global affiliates. Non-discretionary assets includes retainer clients and clients in which AHIC and its global affiliates have performed project services over the preceding 12-month period. Project clients may not currently engage AHIC at the time of the calculation of assets under advisement as the project may have concluded earlier during preceding 12-month period.
[2] As of 12/31/17, from FORM 5500 database; $1T US, $1T Europe, $1T Reinsurance.
[3] In Technology, Life Sciences and Financial Services industries.

The Aon Centre | The Leadenhall Building | 122 Leadenhall Street | London England EC3V 4AN | +44 (0)20 7623 5500 | aon.com | NYSE: AON



**Empower Results®**

*Exhibit D*

# FOX SWIBEL

### FOX SWIBEL LEVIN & CARROLL LLP
200 W. MADISON STREET, SUITE 3000
CHICAGO, ILLINOIS 60606

DANIEL A. DORFMAN
DIRECT DIAL: (312) 224-1246

Email: ddorfman@foxswibel.com

November 19, 2019

*Via Email*

Tracey A. Archbold | Sr. Claim Director
Great American Insurance Group
Fidelity/Crime Division
CrimeInsurance.com
P.O. Box 924 | Farmingdale NJ 07727
tarchbold@GAIG.COM

Mark C. Perlmutter, CPA
T.D. Davidson, CPA, P.C.
595 Route 109, Second Floor
West Babylon, New York 11704
mark@tddavidson.com

|        |                |                                      |
|--------|----------------|--------------------------------------|
| **Re:** | Insured:       | M&C Holdings Delaware Partnership    |
|        | Your Claim No.: | A00110249                           |
|        | Policy No.:    | SAA 5245001 13 00                    |
|        | Claim:         | Wayne Merdis loss                    |

Dear Mr. Perlmutter and Ms. Archbold:

Please be advised that I represent the Insured in the above-entitled claim. This letter will serve to respond to your inquiry of the Insured on October 17, 2019, the October 22, 2019, supplemental email, and your recent conference calls with Adam Furmansky at Aon. The October 17, 2019, initial inquiry inquired as follows:

> *While reviewing information in preparation of our report, we became aware of the following issue: The Insured is claiming stolen commissions for the years 2001 through 2017. The insured provided a schedule of Payments to Merdis' fictitious companies totaling approximately $1.95 million for that period. Of that amount approximately $1.1 Million were commissions due [sic] legitimate third-party travel agencies. However, the list provided to us by the Insured of third-party commissions diverted by Merdis only begins in 2008. Therefore, either Merdis did not divert third*

November 19, 2019
Page 2

> *party commissions during the years 2001 through 2007 (except for $32 in 2004 and $156.50 in 2007), or we have not been provided that information. The Total [sic] commissions claimed stolen for 2001 through 2007 is approximately $580,427. It would seem a significant portion of that amount may have been third party commissions also. Can you inquire one last time about same with the assured.*

To be clear, we do not agree with the above stated allocations, nor do we agree that "Merdis did not divert third party commissions during the years 2001 through 2007." And, third party documentation has been provided by the Insured to Great American ("GA") supporting the $1.954M claim amount. This documentation clearly demonstrates that payments were made by the Insured to the commission payment provider "resulting directly from the dishonest acts" of Mr. Merdis. While the documentation that the Insured has provided for the 2001 through 2007 period does not indicate if the diverted bookings initially were booked through legitimate travel agencies, and if so, which ones, this distinction is of no difference or consequence. As Mr. Furmansky has repeatedly advised GA (most recently on October 10, 2019), it cannot re-write the policy and condition the Insured's loss on the faulty assumption that the legitimate travel agencies have not sought commissions – as the loss occurred at the time of the Insured's transfer of funds due to Mr. Merdis' fraudulent conduct (and to be clear, it is further most likely that the Insured has paid both the legitimate travel agencies <u>and</u> Merdis' fraudulent travel agency). With that said, M&C has conducted a review of its records and is not in possession of any additional requested information (which same response was provided to GA/TD Davidson on October 24, 2019).

Now that all inquiries have been responded to, we appreciate GA's expeditious resolution of this claim. We would like to remind GA that the Proof of Loss was submitted on March 21, 2018. To further understand our frustration on the length of time it has taken for GA to resolve this claim, please see attached material timeline of events.[1] Despite the Insured's responsiveness in providing requested information, the attached timeline clearly demonstrates GA's continued pattern of delay disguised as a request for additional information. That must end now. <u>We therefore demand that GA finalize this claim within fourteen (14) days.</u>

---

[1] There may be additional events not contained herein, and the list provided herein is not intended to be exhaustive.

3823049 v3 - 06895 / 003

November 19, 2019
Page 3

  This letter is not intended to, and does not, set forth all of the Insured's rights, claims, causes of action and remedies against GA, all of which are expressly reserved.

Regards,

Daniel A. Dorfman

cc:  Adam Furmansky, Esq. – VP Financial Services Group at Aon;
    Jonathon Grech, Esq. – SVP, Group General Counsel & Company Secretary at
    Millennium & Copthorne Hotels

3823049 v3 - 06895 / 003

## CLAIM TIMELINE

- On 8/31/2018 Aon submitted M&C's Proof of Loss to Great American
  - o Exit interview statement
  - o Copy of indictment
  - o Excel spreadsheet totaling $1.9M
  - o Emails from TACS providing list of commissions paid to Wayne's address, including both Anayad/Annayad. 3rd party confirmation
  - o Email from Assist. District Attorney and Subpoena production
  - o Wayne Maris verified business and residential addresses: Copies of IRS Form W2's and W4's. Online business' address confirmations.

- On 9/28/2019 Aon provides GA/accountant an unprotected spreadsheet entitled "Millennium Fraud Case. List of Commissions Paid (TACS)-Wayne Merdis 09.27.18.xlsx"

- On 10/24/2018 GA's accountant attaches documents to email stating, "For your reference, attached please find the only support received from M & C initially on this claim. We'll await the supporting records, and your inquiry of the DA, the personnel file, etc. Thanks for your assurance. Mark"

- Email between GA's accountant and Jeremiah on or about November 13, 2018 re: claimed amount. Emails also sent about providing GA's accountant access to the shared drive.

- In November 2018, GA resists signing NDA. Ultimately agrees to sign NDA in December 2018.

- Aon sends employment file to GA on December 20, 2018.

- On 12/6/2018, GA's accountant emails M&C team. GA's accountant attaches a summary of claim documents with attachments. GA's accountant states that he is still reviewing materials, and mentions possible meeting "to explore the system and hot it was changed at the beginning of 2017."

- On 12/11/2018, Cindy Ho has a conference call with GA's accountant and on 12/14/2018, Cindy Ho, sends accountant documents and correspondence relating to the criminal case. This was apparently in response to an information request from the accountant.

- In or about 12/20/2018, GA's accountant inquired about "audit" reports generated by M&C.

- On 1/10/2019, Aon sends request to GA about what document requests remain outstanding and a timeframe on reviewing the submitted materials.

- On 1/14/2019, GA responds that it is reviewing the personnel file and will follow-up with additional questions.

- On 1/14/2019, GA's account responds "As you are aware, I was out last week. It's going to have to wait until I review the new data coupled with the previously submitted records, and also discuss the claim with Tracey. Mark"

- On 1/31/2019, GA's accountant responds, "I'm going to report to Tracey next week."

- On 2/1/2019, GA advises that it will review the claim next week with Mark and address any additional information that he may need. GA also requests all personnel information prior to 2000 for Merdis.

- On 2/7/2019, GA's accountant emails M&C team asking questions about various attached documents.

- On 2/7/2019, Cindy Ho responded to GA's accountant's questions.

- On 2/14/2019, Mark responds to Cindy with a question that was difficult to understand.

- On 2/19/2019, Mark writes to Aon and M&C advising that Great American was told originally that the fraud only involved a reservation where there was no travel agency involvement. GA's accountant asks for clarification.

- On 2/20/2019, Aon writes to Mark and confirms the fraud was effectuated in two different manners.

- On 2/21/2019, Mark states that this contradicts what was original told to GA about the fraud. Mark inquires whether any TA's contacted M&C regarding commissions not received.

- On 2/21/2019, Aon writes to Mark (with M&C's consent) stating that there were many bonafide transactions, and that there may have been occasions wherein the original TA inquired about their commissions, but such inquiries likely went to Mr. Merdis. A call is also offered by M&C to discuss the claim.

- On 2/22/2019, Mark replies that before there is a call, he would like M&C to provide samples of transactions that involved a bonafide TA initially, and then showing the reservation was changed to Merdis/Annayad.

- On 2/22/2019, GA advises it too is waiting for additional personnel information requested on 2/1/2019.

- On 2/22/2019, GA advises it is waiting for the plea agreement and sentencing order, previously requested

- On 3/5/2019, Aon (with M&C consent) sends to GA's accountant example of a transaction where Merdis changed the TA to one of his own.

- On 3/5/2019, Aon sends additional employment file records.

- On 3/14/2019, Aon reaches out to GA re: if any questions in order to expedite claim.

- On 3/21/2019, GA advises it will reach out next week with any questions.

- On 4/11/2019, GA sends a list 12 questions for M&C to answer.

- On 5/29/2019, M&C responds to list of 12 questions from 4/11/2019.

- On 6/3/2019, GA acknowledges receipt of 5/29/2019 email.

- On 6/28/2019, Aon checks in with GA regarding further claim movement in order to expedite the claim.

- On 7/3/2019, GA replies "As a follow up to our telephone conversation, I have completed my review of the information supplied and I need to address the Financial Control Manual with Mark to ensure that he does not have any questions that need follow up. As discussed, he is currently out of the office attending to a family situation. I will follow up with you as soon as possible."

- On 7/12/2019, Aon follows up regarding GA's attempts to connect with Mark and outstanding questions.

- On 7/18/2019, GA states, "Mark's associate Bill, will be back in the office on Monday and will let me know if he has any questions surrounding the Financial Control Manual. In the meantime, I do know that we still need the insured to confirm whether the TAs Mr. Merdis changed to his own name were in fact legitimate reservations, which were owed commissions prior to the change."

- On 7/22/2019, Aon responds to M&C explaining that this question was previously answered.

- On 7/22/2019, GA discusses financial control manual and requests additional information. Subsequent correspondences regarding clarification of request.

- On 8/5/2019, M&C/Aon provide responses to 7/22/2019 questions.

- On 8/20/2019, Aon followed up with GA on timeline in order to expedite claim.

- On 8/26/2019, GA advises that it expects to follow up shortly after Labor Day.

- On 9/10/2019, after no response from GA, Aon requests update from GA.

- On 9/17/2019, Aon again requests update.

- On 9/17/2019, GA advises that it is preparing a response to the insured re: GA's findings to date.

- On 9/20/2019, GA issues a letter again asking for more information.

- On 10/4/2019, Aon discusses claim with GA and refutes position that change from one legitimate TA to Annayad is not Loss.

- On 10/10/2019, Aon sends email response to 9/20/2019 letter.

- On 10/14/2019, GA confirms receipt and states "we will take this into consideration as TD Davidson completes their report and circle back around shortly."

- On 10/17/2019, GA's accountant inquires about 2001-2007 payments.

*Exhibit E*

**From:** Adam Furmansky
**Sent:** 10/10/2019 12:45:13 PM
**To:** Archbold, Tracey
**CC:** Amanda Roxland
**Subject:** [External] RE: M&C Holdings Delaware Partnership / Employee Dishonesty - Merdis - GAIC File: A00110249
**Attachments:**

Tracey,

Below please find M&C's response to your letter dated September 20, 2019. I also ask you, pursuant to our conversation, to confirm that the ~$800k is considered covered loss. Thanks.

---

Initially, you have asked 'Please explain where the unresolved disputes were directed, as well as how and who was responsible to resolve them. If [t]he matters were addressed and resolved elsewhere, indicate if there were records or logs, which addressed the resolutions.' As we have stated on a few other occasions, M&C is not in possession of any records relating to disputes from travel agencies (TAs) concerning those connected with this Claim. Please also see M&C's email (sent through Aon) of May 29, 2019 confirming that no logs were maintained concerning TA complaints.

Moreover, M&C disagrees with Great American's position concerning $1,106,882.65 of the claimed loss amount. The policy contemplates that it will "...pay loss resulting directly from dishonest acts of employees...with the manifest intent to: (i) cause you to sustain loss..." The policy supports coverage for the $1,106,882.65 loss. Here, Mr. Merdis effectuated a fraud directly from extracted over $1.9M from M&C. Of that amount, $1,106,882.65 (according to Great American) was paid to Merdis rather than legitimate TAs. It is of no merit whether M&C paid the legitimate TAs or not. In fact, M&C may elect to (i) pay the TAs upon receipt of funds from Great American, (ii) forgive commissions, or a portion of commissions, for a period of time from the TAs, (iii) or any other avenue it wishes. Moreover, there exists the possibility that (i) M&C paid the legitimate TAs but cannot locate associated records, or (ii) the TAs may demand repayment (assuming M&C did not pay the original TAs, which is not admitted) from M&C at any time. Great American, pursuant to the policy's terms and conditions, is not able to condition a loss on what M&C may or may not have done following the loss, nor on what it may do. Put simply, the loss occurred at the time M&C transferred funds earmarked for Mr. Merdis on a fraudulent premise. Case law supports this conclusion as well.

Great American's attempt to insert additional conditions on the policies' language is impermissible. A simplified analysis is illustrative - in a simplified scenario of one $1,106,882.65 transfer – M&C owed a $1,106,882.65 liability immediately before the transfer; and immediately after the transfer, M&C paid $1,106,882.65 to the fraudster and still maintained a $1,106,882.65 liability. Great America's attempt to view the loss in hindsight and with additional policy terms is misplaced. Great American, by the policy's terms, cannot act as judge and jury and rule the original TAs earned commissions moot.

Reconsideration is requested and M&C reserves all rights. We request that Great American respond within ten days.

Best,
Adam

**Adam S. Furmansky, Esq.** | **Vice President**
**Aon** | **Financial Services Group**
One Liberty Plaza, 165 Broadway, New York, NY 10006
**T:** 212-441-2259 **Email :** adam.furmansky@aon.com

**From:** Archbold, Tracey <tarchbold@GAIG.COM>
**Sent:** Friday, September 20, 2019 9:32 AM
**To:** jonathon.grech@milleniumhotels.com
**Cc:** janlyn.mahlman@milleniumhotels.com; mark tddavidson.com <mark@tddavidson.com>; Adam Furmansky <adam.furmansky@aon.com>; Amanda Roxland <amanda.roxland@aon.com>
**Subject:** M&C Holdings Delaware Partnership / Employee Dishonesty - Merdis - GAIC File: A00110249

**Tracey A. Archbold** | Sr. Claim Director
732.919.1870 | 513.369.7523 e-fax
Great American Insurance Group
**Fidelity/Crime Division**
CrimeInsurance.com
P.O. Box 924 | Farmingdale NJ 07727

The content of this e-mail message and any attachments are confidential and may be legally privileged, intended solely for the addressee. If you are not the intended recipient, be advised that any use, dissemination, distribution, or copying of this e-mail is strictly prohibited. If you receive this message in error, please notify the sender immediately by reply email and destroy the message and its attachments.

*Exhibit F*

# Franzblau Dratch, P.C.

S.M. Chris Franzblau
Stephen N. Dratch*
Julian Wilsey
Brian M. Dratch*
Shay Shailesh Deshpande*

**Attorneys At Law**
Plaza One
354 Eisenhower Parkway
P.O. Box 472
Livingston, New Jersey 07039-0472

OF COUNSEL
Richard E. Mischel*
Allen B Pearl
Adam D. Dratch*

* NJ & NY BAR

NEW YORK OFFICE
233 Broadway, Suite 1800
New York, NY 10279
(212) 571-1808
Please reply to NJ Office
WEBSITE: www.njcounsel.com

Main Office (973) 992-3700
Telecopier (973) 994-0130
Writer's Direct Dial: (973) 533-7212
email: sdratch@njcounsel.com

December 17, 2019

**VIA EMAIL**: ddorfman@foxswibel.com
Daniel A. Dorfman
Fox Swibel
200 West Madison Street
Suite 3000
Chicago, Illinois 60606

      Re:    M&C Holdings Delaware Partnership ("M&C" or "Insured"), Claim A00110249

Dear Mr. Dorfman:

      I am counsel for Great American Insurance Company ("GAIC" or the "Insurer") in connection with the above-referenced claim that was submitted under Policy No. SAA 524500 13 00 (the "Policy"). Accordingly, I ask that you communicate directly with me going forward in connection with this matter.

      I write in response to your letter of November 19, 2019 in which you demanded that GAIC "finalize" the Insured's claim. For the reasons set forth below, it is GAIC's position, based on the information it has received, that the Insured has only been able to prove that $267,035.90 of its claimed loss of $1,954,329.13 is covered under the Policy. Nevertheless, as a good faith effort to settle the claim, GAIC is willing to add $112,602.97 to the Insured's covered loss, which has been calculated in the matter set forth below.

## FACTUAL BACKGROUND

      M&C'S claim arises out of a fraudulent scheme perpetrated by its longtime employee Wayne Merdis ("Merdis"). Specifically, starting in 2001 and continuing through 2017, Merdis created a fictional travel agency called Annayad Travel, which he employed to divert funds (totaling $1,954,329.13) related to commissions for reservations he attached to Annayad Travel.

      GAIC retained Mark Perlmutter of TD Davidson CPA, P.C. to help in its investigation of M&C's claim. Mr. Perlmutter determined that Merdis perpetrated his scheme in two ways. Under the first

Daniel A. Dorfman
December 17, 2019
Page 2

method, Merdis would divert legitimate commissions that were owed to legitimate third-party travel agencies to Annayad Travel. (Hereafter, the "Legitimate Travel Agent Method"). Thus, under the Legitimate Travel Agent Method, M&C did legitimately owe the monies to third parties, but Merdis improperly diverted them to himself. Under the second method, Merdis paid commissions to Annayad Travel for bookings for which commissions were not owed to a third-party travel agent. (Hereafter, the "Fictitious Commission Method"). Thus, under the Fictitious Commission Method, Merdis diverted funds that M&C was not otherwise obligated to pay to any third parties.

The Insured was not able to provide sufficient information necessary to allow Mr. Perlmutter to determine the amounts that Merdis diverted under the Legitimate Travel Agent Method and the Fictitious Commission Method for the period of 2001 through 2007, that information having been "purged" from M&C's records. Still, Mr. Perlmutter concluded that $580,427.68 was diverted to Annayad Travel during this time period, although, again, how precisely Merdis managed to do so is unclear.

The picture is clearer for 2008 through 2017. Specifically, Mr. Perlmutter concluded Merdis diverted $1,106,865.55 pursuant to the Legitimate Travel Agent Method and $267,035.90 pursuant to the Fictitious Commission Method. Or, during the 2008 through 2017 time period, Merdis diverted 19.4% of total pursuant to Fictitious Commission Method and 80.6% pursuant to the Legitimate Travel Agent Method.

As I understand it, none of the legitimate travel agents whose commissions Merdis diverted to Annayad Travel have ever demanded payment for commissions they presumably were owed but never received. I am further informed that M&C has not explained why none of the legitimate travel agents ever complained about not receiving commissions they were owed and have not sought payment from M&C even after Merdis' scheme was revealed.

## ANALYSIS

M&C seeks coverage under Insuring Agreement 1 for Employee Dishonesty (Policy § B(1)) which provides, in relevant part:

> We will pay for loss resulting directly from dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, with the manifest intent to:
>
> a. Cause you to sustain a loss; and
>
> b. Obtain an improper financial benefit for:

00185526 - 1

Daniel A. Dorfman
December 17, 2019
Page 3

      (1) the employee; or

      (2) any person or organization intended by the employee to
          receive that benefit.

Thus, under the Policy, the Insured must have actually suffered a "loss resulting directly form dishonest acts committed by an employee." While the Policy does not define the term "loss," courts have held that a "bookkeeping loss" where none of the insured's assets have been depleted as a result of employee dishonesty is not a direct loss under substantially similarly worded policies. *F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994). For example, where the dishonesty employee causes illicitly gained funds to pay down another debt owed to the insured, the "loss" (or part of the loss) is deemed a wash and therefore considered not to have occurred. *See, e.g., Citizens Bank & Trust Co.v. St. Paul Mercury Ins. Co.*, 2007 WL 4973847, at **3-4 (S.D. Ga. Sept. 14, 2007); *BancInsure, Inc. v. Peoples Bank of the South*, 866 F. Supp. 2d 577, 588 (S.D. Miss. 2012). Indeed, the Tenth Circuit has held that there is no loss to an employer as a result of employee dishonesty where the employee misappropriates property belonging to third parties when those third-parties have not or cannot pursue claims against the employer. *Spears v. St. Paul Ins. Co.*, 40 F.3d 318, 319-20 (10th Cir. 1994).

Here, it is GAIC's position that only those monies that Merdis embezzled under the Fictitious Commission Method constitute covered losses. This is because Merdis depleted funds from M&C that it otherwise did not legitimately owe to any third-party. By contrast, GAIC has concluded that funds Merdis diverted from legitimate travel agents under the Legitimate Travel Agent Method are not covered to the extent that the legitimate travel agents cannot or will not seek to recover commissions that were owed to them but which they have not received. Under this scenario, Merdis took funds for himself that M&C was otherwise obligated to pay. As those third parties have not been paid for the commissions owed and have not sought to recover funds owed to them, the "loss" is illusory under such circumstance.

By email dated October 10, 2019 that was forwarded by the broker to GAIC, M&C took the position that there was nonetheless a loss for funds diverted under the Legitimate Travel Agent Method because "M&C may elect to (i) pay the TAs upon receipt of funds from Great American, (ii) forgive commissions, or a portion of commissions, for a period of time from the TAs, (iii) or [sic] any other avenue it wishes." Respectfully, suggesting that the Insured might, on its own initiative, choose to reimburse all or a portion of the amounts legitimate travel agents were entitled to, but have never demanded does not otherwise create a loss that the Policy covers.

That email similarly raises the possibility that "(i) M&C paid the legitimate TAs but cannot locate associated records, or (ii) the TAs may demand repayment (assuming M&C did not pay the original TAs, which is not admitted) from M&C at any time." As noted above, the possibility that M&C might at some future point pay the unpaid travel agents – whether voluntarily or under compulsion – does not create a covered loss. Indeed, it seems highly unlikely that travel agents, after all this time, will

Daniel A. Dorfman
December 17, 2019
Page 4

actually seek reimbursement as, according to the Insured's May 29, 2019 response to GAIC's request for information (item number 5), "Complaints concerning TA payments are directed to Finance" but "There was/is no log of TA payment complaints maintained." Similarly, the Insured's suggestion that it did pay legitimate TAs but cannot locate corresponding records does not comport with "Records" condition of the Policy (Section E(18)), which provides: "You must keep records of all covered property so we can verify the amount of ay loss." This condition of sufficient record keeping for a finding of coverage flows from the axiom that it is the burden of the insured to establish a covered loss and the amount thereof. *United Pacific Ins. Co.*, 20 F.3d at 1080 ("A fidelity insurance contract indemnifies against loss, and the insured has the burden of proving that it suffered an actual loss by a preponderance of the evidence.") (citations omitted).

Based on the foregoing, GAIC has concluded that M&C has only been able to prove that it has suffered a covered loss of $267,035.90, which as specified above is the amount that M&C's records demonstrate Merdis was able to divert to himself under the Fictitious Commission Method. Thus, accounting for the Policy's $250,000 deductible, GAIC is obligated to make a payment of $17,035.90.

Nevertheless, in a good faith attempt to resolve M&C's claim, GAIC is willing to carry over the percentage of the funds that Merdis misappropriated pursuant to the Fictitious Commission Method from the period of 2008 to 2017 (for which M&C had sufficiently complete records) to the period of 2001 to 2007, for which there are insufficient records to determine what method Merdis used to divert funds to himself. Accordingly, GAIC, for settlement purposes only, will add 19.4% of $580,427.68, or $112,602.97, to M&C's covered loss.

Lastly, GAIC will, on a case by case basis, review any demands that third-party travel agents might make on M&C for monies owed to them that Merdis diverted to Annayad Travel under the Legitimate Travel Agent Method. Should GAIC determine specific claims for payment could realistically be recovered against M&C by a third-party travel agent (*e.g.* are not otherwise barred by any applicable statute of limitations) GAIC will take appropriate action to ensure that M&C is made whole consistent with the terms of the Policy.

Please be aware that GAIC's reference to specific provisions of the Policy or particular case law does not, nor is it intended to, waive any of the rights or defenses GAIC may have under the terms of the Policy or at law, and GAIC explicitly reserves any and all such rights or defenses.

Very truly yours,

Stephen N. Dratch

SND/dam

cc:     Jonathon Grech Via email: jonathon.grech@milleniumhotels.com
        Adam S. Furmansky, Esq. Via email: adam.furmansky@aon.com

00185526 - 1

*Exhibit G*

From: Dorfman, Daniel [mailto:ddorfman@foxswibel.com]
Sent: Tuesday, January 21, 2020 3:51 PM
To: Stephen Dratch <SDratch@njcounsel.com>
Cc: 'Jonathon Grech' <Jonathon.Grech@millenniumhotels.co.uk>; Adam Furmansky
<adam.furmansky@aon.com>
Subject: M&C Holdings Delaware Partnership and all other Insureds; Your Claim: A0110249

Mr. Dratch,

We are in receipt of your letter dated December 17, 2019 ("Denial Letter") on behalf of Great American Insurance
Company ("Great American"). The Denial Letter communicates that Great American intends to deny and refuse to
pay the vast majority the $1,954,329.13 claim (the "Claim") submitted by my client, M&C Holdings Delaware
Partnership and its affiliate Named Insureds ("Millennium")

There is no reasonable basis for Great American's denial, just as there has been no reasonable basis for its
lengthy delay in processing this claim.

Millennium Plainly Established Coverage Under Insuring Agreement 1. Insuring Agreement 1 affords coverage for
the peril that befell Millennium. Our analysis is informed in part by what Great American does not dispute or
disprove. Great American acknowledges that Wayne Merdis was an employee of Millennium, and that his sham
travel agency schemes were dishonest acts. It does not dispute that every penny of the Claim represents sums
transferred from Millennium bank accounts to Merdis' sham agencies. Nor does Great American show that
Millennium received any value from the sham entities in return for these transfers.

Payments made on false claims submitted by an employee are covered under Insuring Agreement 1, unless Great
American advances a basis for an exclusion to apply. The Denial Letter does not identify any such exclusion.
Instead, it advances a single, limited basis for denial: that the vast majority of the claim does not constitute "loss,"
but supposedly non-covered "bookkeeping loss." This position lacks factual and legal merit, as explained below.

Great American's Speculative Factual Assertions Lack Merit. The Denial Letter does not justify the factual basis
for its position. It appears that the lone premise for this argument is Great American's "understanding" that
legitimate agencies never demanded payment for commissions they "presumably never received." No evidence
supporting this conclusion is provided. Indeed, in the Denial Letter, Great American wonders aloud why such
agencies have not complained or sought payment from Millennium "even after Merdis' scheme was revealed." The
inference is obvious - legitimate agencies have not complained because they were paid in addition to the amounts
paid to Merdis for his false claims. Otherwise, the legitimate agencies would have complained, just as any
business would.

Great American's view of the facts defies logic and common sense, and raises the bar for proof of loss to
something like "proof beyond any existential doubt." Millennium need not meet such an impossible standard.
Lacking actual evidence for its "presum[ption]" that legitimate agencies were never paid, Great American's position
is manifestly unreasonable.

Great American's Legal Position Is Wrong As A Matter Of Law. Suppose that, as Great American claims, Merdis's

scheme merely "diverted" payments to his sham agencies, and legitimate agencies were indeed never paid. Again, there is no proof of this. But even if this were proven, the transfer of funds to the sham agencies alone constitutes a covered "loss" under the Crime Protection Policy, full stop.

As you know, the term "loss" is undefined. It will be construed in favor of the insured. Further, the lack of these provisions excluding "bookkepping" or "accounting" loss also undermines Great American's coverage position - its position would require a court to insert language that it failed to bargain for in the policy.

Indeed, courts across the country have held that the term "loss" occurs when money is transferred from the insured's control, under similar policies involving nearly identical facts:

   *   The Cincinnati Ins. Co. v. The Norfolk Truck Center, Inc., 2019 WL 6977408 (E.D. Va. Dec. 20, 2019) ("loss" occurred in computer fraud policy where an "[i]mposter fraudulently caused Defendant to pay a legitimate invoice to the wrong payee").
   *   Am. Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am., 895 F.3d 455, 461 (6th Cir. 2018) ("Travelers' theory would have us say that Casey caused no direct loss to Alex because Alex owed that money to Blair and was preparing to hand him the five-dollar bill. This interpretation defies common sense.").
   *   Medidata Sols. Inc. v. Fed. Ins. Co., 729 F. App'x 117, 119 (2d Cir. 2018) ("New York courts generally equate the phrase 'direct loss' to proximate cause," finding loss of funds resulting from spoofing attack was covered by computer fraud policy).
   *   XL Specialty Ins. Co. v. Loral Space & Commc'n, Inc., 82 A.D.3d 108, 113, 918 N.Y.S.2d 57, 61 (2011) (rejecting argument that D&O insurer was not obligated to reimburse insured for the attorney fees it was required to pay to opposing party out of pocket, on the supposed grounds that insured suffered only a "reduced benefit," not a loss, because the net result of the suit resulted in an overall benefit to the insured); Ali v. Fed. Ins. Co., 719 F.3d 83, 93 (2d Cir. 2013) (loss occurs and is affixed when property is lost by insured or liability payments are made to third parties, ignoring the accrual of liability to pay third parties).
   *   Fed. Ins. Co. v. Srivastava, 2 F.3d 98, 103 (5th Cir.1993) ("the insured's loss was fixed before any settlement with the primary insurers . . . With a burglary of property, the insured loss was established.") (citing Zeig v. Massachusetts Bonding & Ins. Co., 23 F.2d 665, 666 (2d Cir. 1928) (Hand, J.)).

The authorities cited by Great American are not to the contrary. If anything, they demonstrate that coverage is required here:

   *   Spears v. St. Paul Ins. Co., 40 F.3d 318, 319 (10th Cir. 1994), a bankruptcy case, concerned a scheme in which an employee caused a third party client of the insured to pay his sham agency using that third party's funds, for services the agency did not render to such third party. It does not concern a scheme in which the insured paid its own money to the sham agency that the sham agency did not render to insured.
   *   F.D.I.C. v. United Pac. Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994) does hold that the policy there did not cover mere "bookkeeping loss." But the court ultimately ruled in favor of the insured, holding it "suffer[ed] a loss when funds [we]re disbursed due to the employee's wrongful conduct," and this is true "regardless of the security" held by the insured for that loss. The case shows that the disbursement of funds is alone sufficient to prove loss, whether or not the insured suffered other consequences (i.e., claims filed by third parties who were allegedly not paid).
   *   Citizens Bank & Tr. Co. v. St. Paul Mercury Ins. Co., 2007 WL 4973847, at *4 (S.D. Ga. Sept. 14, 2007), likewise adopts a "cash-out-the-door theory" of "direct loss," and holds that "actual withdrawals of cash or other such pecuniary loss" by the Insured are recoverable.
   *   BankInsure, Inc. v. Peoples Bank of the S., 866 F. Supp. 2d 577, 588 (S.D. Miss. 2012) does not involve a similar policy, as Great American claims. It concerns the scope of an exclusion related to whether a transaction was or was not a "loan".

As Great American's own cases indicate, "loss" occurs when funds are lost or disbursed from an insured's accounts, due to a dishonest act. Millennium proved that its cash went out the door. Nothing more is required to establish coverage and payment of the full amount of its Claim.

The Claim Must Be Paid In Full.   In light of the above, continued delay of reimbursing this Claim is unacceptable. Great American's conduct to date, leading up and including its unreasonable denial, appears to be nothing more than an exercise in bad faith.  We are confident that a judge and jury would agree.

Millennium rejects Great American's offer to compromise the Claim as set forth in its Denial Letter.

Millennium instead reiterates its demand that Great American pay the Claim in full.  Further to this demand, please see attached a draft complaint Millennium intends to file in the Southern District of New York by February 7, 2020, unless Great American confirms before then that it will pay the Claim in full, as requested.  Millennium demands a full response to the statements and authorities cited herein and in the draft complaint.  Otherwise, if Great American wishes to revisit its position and cover the Claim in full before then, please let me know.  I am also available to discuss at your convenience.

Millennium reserves all rights and remedies under applicable law.

Regards,


Daniel A. Dorfman
Chair, Construction Law Group
ddorfman@foxswibel.com<mailto:ddorfman@foxswibel.com>  *  312-224-1246 (direct)  |  (312) 339-2966 (cell)

[Fox-Swibel-Half-Logo-(300ppi)(6.15.16)]
Fox Swibel Levin & Carroll llp

200 W. Madison Street, Suite 3000 *  Chicago, Illinois 60606
www.foxswibel.com<http://www.foxswibel.com/> *  312-224-1200 (main) *  312-224-1201 (fax)
[Description: Description: Description: Description: leed]

Confidentiality:  This transmission is for the exclusive and confidential use of the intended recipient. It may be an attorney-client communication and privileged. The unauthorized use, disclosure or copying of this transmission is strictly prohibited and may be unlawful. If you have received this transmission in error, please notify me by return mail or telephone and delete the transmission from your system. Thank you.

_____

4 attachments

FOX SWIBEL   **image001.png**
6K

LEED
GREEN
ASSOCIATE   **image002.jpg**
2K

**noname**
0K

**2020-01-21 Millennium Complaint (CONFIDENTIAL - SUBJECT TO FRE 408).pdf**
37K

*Exhibit H*

# Franzblau Dratch, P.C.

S.M. Chris Franzblau
Stephen N. Dratch*
Julian Wilsey
Brian M. Dratch*
Shay Shailesh Deshpande*

OF COUNSEL
Richard E. Mischel*
Adam D. Dratch*

* NJ & NY BAR

Attorneys At Law
Plaza One
354 Eisenhower Parkway
P.O. Box 472
Livingston, New Jersey 07039-0472

NEW YORK OFFICE
233 Broadway, Suite 1800
New York, NY 10279
(212) 571-1808
Please reply to NJ Office
WEBSITE: www.njcounsel.com

Main Office (973) 992-3700
Telecopier (973) 994-0130
Writer's Direct Dial: (973) 533-7212
email: sdratch@njcounsel.com

January 31, 2020

**VIA EMAIL**: ddorfman@foxswibel.com
Daniel A. Dorfman
Fox Swibel
200 West Madison Street
Suite 3000
Chicago, Illinois 60606

      Re:    <u>M&C Holdings Delaware Partnership ("M&C" or "Insured"), Claim A00110249</u>

Dear Mr. Dorfman:

      I am in receipt of your email, dated January 21, 2020, in which you responded to my letter of December 17, 2019 (that you referred to as a "Denial Letter") and that attached a draft complaint indicating that you intend to bring suit in the United States District Court for the Southern District of New York. Please accept this letter as response to the multitude of issues your email raises. (Unless otherwise noted, capitalized terms used herein have the same meaning as in my December 17 letter).

      As an initial matter, it would appear that the suit that you intend to bring would be time barred by Section E(11)(c) of the Policy, which provides that "You may not bring any legal action against us involving loss [u]nless brought within 2 years from the date you discover the loss." According to M&C's Proof of Loss, it discovered the loss in June of 2017 meaning that the time to bring suit expired no later than the end of June 2019.

00185526 - 1

Daniel A. Dorfman
January 31, 2020
Page 2

Notwithstanding the above, I must make clear that GAIC takes issue with your description of my December 17 letter as a "Denial Letter." As I hope my prior letter made clear, GAIC did not deny your client's claim, but rather determined that a portion of the quantum of the claimed loss was not actually a loss under the Policy. In particular, GAIC determined that monies that were paid to Merdis as commissions that were not otherwise owed to legitimate travel agents constituted a covered loss. However, there is no coverage to the extent that Merdis diverted legitimately owed commissions to himself without sufficient evidence that the legitimate travel agent in each instance demanded payment and was, in fact, paid.

You take several issues with this position, one of which appears to be that it is GAIC's burden to prove that legitimate travel agents were not paid. Beyond placing GAIC in the position of having to prove a negative, this position is at odds with the Policy language and basic tenets of insurance law. As I pointed out to you in my December 17 letter, Section E(18) of the Policy provides that M&C "must keep records of all covered property so we can verify the amount of any loss." And, it is axiomatic that it is the insured's burden to establish its loss including the quantum of loss. *See, e.g., Jacobson Family Investments, Inc. v. Nat'l Union Fire Ins. Co.*, 102 A.D.3d 223, 231 (1st Dep't 2012) ("[insured] has the burden of proof as to whether the entire loss it claims is covered by the bond") (citation omitted). Thus, it is M&C's obligation to demonstrate, for purposes of the portion of its claim that falls under the Legitimate Travel Agent Method, that it did pay legitimate travel agents under those circumstances. Indeed, it would appear to me that legitimate travel agents were never actually paid or even made demands for payment as Merdis's scheme would have been discovered sooner had they done so. As I

00185526 - 1

Daniel A. Dorfman
January 31, 2020
Page 3

noted in my letter, however, GAIC is willing to review any demands that might be made by third-party

travel agents against M&C and take appropriate action.

GAIC also takes issue with your argument that there is a covered loss regardless of the method

Merdis used to enrich himself. In doing so, I must stress that I strongly disagree with the claim that

when Merdis stole money under the Legitimate Travel Agent Method, the result was that M&C received

no value for the money it disbursed. To the contrary, M&C did receive value in the form of rooms that

were booked by the legitimate travel agents, and it was these travel agents (and not M&C) who suffered

the loss when Merdis diverted the commissions owed to them to himself (again, assuming that those

travel agents were not actually paid for the same booking). Thus, the scheme Merdis used in the

Legitimate Travel Agent Method is analogous to the facts in *Spears v. St. Paul Ins. Co.*, 40 F.3d 318

(10th Cir. 1994) where the court concluded that it was third-parties and not the insured that suffered the

loss absent the insured reimbursing those third-parties for the fraud its employee perpetrated on them.

And it is for this reason that the cases cited in your email do not change the analysis and, if

anything, support GAIC's position. Specifically, in *Cincinnati Ins. Co. v. Norfolk Truck Ctr., Inc.*, (E.D.

Va. Dec. 20, 2019) the insured wired money to an imposter for truck parts the insured had ordered.

There was no dispute that there was a loss since the insured disbursed money for something it did not

receive, and therefore the issue, which was a resolved in the insured's favor, was whether the loss was

from the use of a computer. Here, as noted above, M&C did receive value for the funds it disbursed in

the form of rooms that were booked by legitimate travel agents.

In *American Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 461 (6th Cir.

2018) the insured was also duped into wiring funds to a fraudster who was impersonating one of the

Daniel A. Dorfman
January 31, 2020
Page 4

insured's vendors, only in this instance the vendor had performed its services to the insured. Critically,

after the fraud was revealed, the insured agreed to pay the vendor half of the money it owed and agreed

that payment of the remaining half would be contingent on the success of its claim against the insurer.

*Id.* at 458. Thus, the Sixth Circuit rejected the insurer's claim that there was no loss. *Id.* at 460-61.

Here, by contrast, there is no proof that M&C paid the legitimate travel agents from whom Merdis

diverted earned commissions, and GAIC has made clear that it will review specific travel agent demands

for payments and take appropriate action consistent with the terms of the Policy.

The other cases your email cites warrant little discussion as they address other issues that have

no bearing on M&C's claim. *Medidata Solutions Inc. v. Fed. Ins. Co.*, 729 Fed. Appx. 117 (2d Cir.

2018) (addressing loss causation, not whether the insured actually suffered a loss); *XL Specialty Ins. Co.*

*v. Loral Space & Commc'n, Inc.*, 82 A.D.3d 108 (1st Dep't 2011) (addressing whether attorneys fees

fell under the policy's definition of loss); *Ali v. Fed. Ins. Co.*, 719 F.3d 83 (2d Cir. 2013) (addressing

whether primary and underlying policy in excess insurance "tower" were exhausted before excess

policies was required to pay); *Federal Ins. Co. v. Srivastava*, 2 F.3d 98 (5th Cir. 1993) (same).

In sum, GAIC is not disputing that Merdis unjustly and criminally enriched himself. The issue

for purposes of M&C's claim is at whose expense. Absent additional information, it is clear that to a

large extent his real victims were the legitimate travel agents who provided value to M&C but ultimately

received no compensation. Accordingly, GAIC's analysis and evaluation of M&C's claim has not

changed. Nevertheless, GAIC's settlement offer stated in my previous letter remains open. And again,

GAIC's reference to specific provisions of the Policy or particular case law in this letter or my previous

```
Daniel A. Dorfman
January 31, 2020
Page 5
```

letter does not, nor is it intended to, waive any of the rights or defenses GAIC may have under the terms

of the Policy or at law, and GAIC explicitly reserves any and all such rights or defenses.

Very truly yours,

Stephen N. Dratch

SND/dam