## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

M&C HOLDINGS DELAWARE,
PARTNERSHIP, et al.,
      Plaintiffs,

     v.

GREAT AMERICAN INSURANCE
COMPANY,
     Defendant.

Case No. 1:20-cv-121

Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

This matter is before the Court on defendant Great American Insurance Company (Great American)'s motion to dismiss (Doc. 18); the response in opposition by plaintiffs M&C Holdings Delaware Partnership, M&C Hotel Interests, Inc., M&C Management Services (USA), Inc., CDL Hotels (USA), Inc., and RHM-88, LLC (collectively, Millennium) (Doc. 19); and Great American's reply (Doc. 22). Millennium also filed a separate objection (Doc. 21) to the exhibits attached to Great American's motion to dismiss and Great American responded (Doc. 23). For the reasons that follow, the Court recommends that Great American's motion to dismiss be denied and that Millennium's objection to the exhibits attached to Great American's motion to dismiss be overruled in part and sustained in part.

## I.     Background[1]

Millennium operates a chain of hotels throughout the United States. In the ordinary course of its business, Millennium paid commissions to third-party travel agencies in exchange for bookings at its One UN Hotel, located in New York, New York. A Millennium employee, Wayne Merdis, engaged in a fraudulent scheme to siphon off these commission payments from

---

[1] The factual background provided is derived from Millennium's complaint and attached insurance policy. (Doc. 1 & Ex. A).

Millennium.  He did so in two different ways.  Merdis either diverted commissions legitimately owed to third-party agencies, or he collected commissions he was *not* legitimately owed on behalf of fictitious travel agencies he had created.  Millennium alleges that both types of commission payments amounted to $1,954,329.13, all of which it transferred to Merdis's fictitious travel agencies as a result of his fraudulent scheme.

Great American had issued Millennium a crime protection insurance policy (Policy) for the period of May 31, 2017 through May 31, 2018.  In relevant part, the policy provided that Great American would "pay for loss covered by an Insuring Agreement of this Policy that [Millennium] sustain[s] resulting directly from acts committed or events occurring at any time and discovered by you during the Policy Period . . . ."  (Doc. 1, Ex. A at PAGEID#: 25).  As it relates to "Employee Dishonesty" specifically, the Policy states:

> We will pay for loss resulting directly from dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, with the manifest intent to:
>
> a. Cause you to sustain loss; and
>
> b. Obtain an improper financial benefit for:
>
>> (1) the employee; or
>>
>> (2) any person or organization intended by the employee to receive that benefit.

(*Id.*) (emphasis deleted).  "Loss" is not defined in the policy.

Millennium gave Great American notice of its claim of loss in the amount of $1,954,329.13 resulting from Merdis's fraudulent scheme.  Millennium's complaint does not include the date that it discovered the loss, but the above-quoted Policy language establishes that Millennium's discovery must have occurred between May 31, 2017 and May 31, 2018 to qualify as a covered loss.  Great American investigated and sent a letter to Millennium on December 17,

2019 stating that most of Millennium's claim was not a covered loss.  Great American distinguished between the commissions paid out by Millennium that were intended for legitimate travel agencies and those intended for Merdis's fictitious third-party travel agencies.  Millennium filed suit in February 2020 for breach of contract, bad faith denial of coverage, and declaratory relief.

## II.    Law

Great American seeks dismissal under Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations as true and make reasonable inferences in favor of the non-moving party.  *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)).  Only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  "[T]he statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Id.* (internal quotation marks omitted) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  Although the plaintiff need not plead specific facts, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  "A plaintiff must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The parties agree that Ohio substantive law governs this suit.  (Doc. 18-1 at PAGEID#: 124 ("There appears to be no true conflict between the laws of these three jurisdictions, and hence Ohio law should generally apply."); Doc. 19 at PAGEID#: 174 n.3 ("Plaintiffs agree with Defendant's conclusion that Ohio law governs in this diversity action.")).

### A.    Great American's exhibits

Great American attached the declaration of its counsel and several exhibits in support of its motion to dismiss, including a "Proof of Loss" form (Doc. 18-2 at Ex. A) (referenced in Compl. ¶¶ 27, 28, 62), a claim notification letter from Aon[2] on behalf of Millennium dated June 23, 2017 (*Id.* at Ex. B) (referenced in Compl. ¶¶ 27–28), a publicly available company fact sheet for Aon (*Id.* at Ex. C), a November 19, 2019 letter from Millennium's counsel describing frustrations with Great American's claim investigation (*Id.* at Ex. D), an October 10, 2019 email from Aon explaining Millennium's disagreement with Great American's position on its claim (*Id.* at Ex. E), December 17, 2019 correspondence from Great American's counsel (*Id.* at Ex. F) (referenced in Compl. ¶¶ 39–41), a January 21, 2020 email from Millennium's counsel in response (*Id.* at Ex. G), and a January 31, 2020 letter from Great American's counsel in reply (*Id.* at Ex. H) (referenced in Compl. ¶¶ 47–48).

Millennium attached its counsel's declaration to its opposition to the motion to dismiss and separately objected to the Court's consideration of Great American's additional exhibits. (Docs. 19-1, 21).  Millennium does not appear to challenge the legitimacy of these exhibits, though it challenges the validity of their content and their consideration under Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  (*See* Doc. 19 at PAGEID#: 178–80; Doc. 21).  Specifically, Millennium argues that the declarant, Great American's attorney of record, did not attest to his personal knowledge of the documents contained in the exhibits or address their admissibility.  (*See id.*).

---

[2] Great American identifies Aon as "Millennium's Broker."  (Doc. 18-1 at PAGEID#: 118).  Millennium does not reference Aon or any broker in its complaint.

Great American's exhibits constitute pleadings if they are "referred to in [the] complaint and central to the claim." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) (citation omitted).  But if the parties dispute the validity of such a document, or even the statements contained in the document, it should not be considered on a motion to dismiss.  *Burns v. United States*, 542 F. App'x 461, 466 (6th Cir. 2013) ("While Plaintiff does not dispute the validity of the document . . ., he disputes the validity of the statements in the document relied upon by Defendant, which similarly disqualifies the exhibit from consideration on a motion to dismiss.") (citation omitted).  In addition, "public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies" may constitute "pleadings."  *Armengau*, 7 F. App'x at 344 (citation omitted).

Otherwise, a court may consider non-pleadings only if it converts the motion to "one for summary judgment under Rule 56" and ensures that all parties have adequate notice and opportunity to respond.  Fed. R. Civ. P. 12(d).  The decision to convert a motion to dismiss into a motion for summary judgment is a matter of discretion.  *See Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000) ("The district court's procedural decision to enter summary judgment sua sponte . . . is reviewed for abuse of discretion."); *Batt v. United States*, 976 F. Supp. 1095, 1096–97 (N.D. Ohio 1997) ("The decision to exclude material outside the pleadings is entirely within the discretion of the trial court.").

The documents attached to Great American's motion to dismiss as Exhibits A and B, Millennium's proof of loss form and claim notification letter, are referred to directly in Millennium's complaint and are relevant to the start and expiration of the Policy's limitations period.  Millennium characterizes the date of discovery of the loss as a "fact[] outside the

pleadings . . . ." (Doc. 19 at PAGEID#: 186). But other than generalized arguments that Great

American's counsel's declaration accompanying these additional exhibits did not lay a sufficient

evidentiary foundation for their consideration, Millennium does not appear to seriously challenge

the authenticity of Exhibits A and B. *See Weiner v. Klais & Co.*, *Inc.*, 108 F.3d 86, 89 (6th Cir.

1997), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[A]

defendant may introduce certain pertinent documents if the plaintiff fails to do so. . . .

Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by

failing to attach a dispositive document upon which it relied.") (citations omitted). The Court

therefore considers Exhibits A and B as part of the pleadings.

Exhibits F and H to Great American's motion to dismiss are letters from Great

American's counsel, and Millennium refers to these letters in its complaint. But Millennium

disputes their substance, which "disqualifies the exhibit[s] from consideration on a motion to

dismiss." *Burns*, 542 F. App'x at 466. The remaining Exhibits (C, D, E, and G)[3] are not

specifically referred to in Millennium's complaint. While they may be relevant to its allegations,

they are not pleadings; they do not hold independent, central significance to Millennium's claims

and are not necessary to the Court's disposition of Great American's motion to dismiss.

Aside from Exhibits A and B, which the Court considers part of the pleadings, it will not

consider the remaining exhibits. It is therefore unnecessary to convert Great American's motion

to dismiss to one for summary judgment or consider the applicability of Fed. R. Civ. P. 56(c).

*Cf. Marsilio v. Vigluicci*, 924 F. Supp. 2d 837, 847 (N.D. Ohio 2013) (declining to convert a

motion under Fed. R. Civ. P. 12(c) to one under Fed. R. Civ. P. 56 in part because there had been

---

[3] These include Aon's company fact sheet, the November 19, 2019 letter from Millennium's counsel describing frustrations with Great American's claim investigation, the October 10, 2019 email from Aon explaining Millennium's disagreement with Great American's position on its claim, and the January 21, 2020 email from Millennium's counsel responding to correspondence from Great American's counsel, respectively.

virtually no discovery in the case). Millennium's evidentiary objection to the additional exhibits should be overruled in part and sustained in part.

### B.     Is Millennium's claim a loss covered by the Policy?

"A liability insurer's obligation to its insured arises only if the claim falls within the scope of coverage." *Schmidt v. Travelers Indem. Co. of Am.*, 101 F. Supp. 3d 768, 776 (S.D. Ohio 2015) (quoting *Cincinnati Indem. Co. v. Martin*, 710 N.E.2d 677, 678 (Ohio 1999)). Generally, the burden rests with the party seeking recovery under an insurance policy to demonstrate coverage and prove a loss. *Id.* (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)).

The central question dividing the parties is the meaning of the term "loss" under the Policy. Millennium contends that it suffered a loss that occurred as soon as it disbursed the commission payments, which Merdis diverted. Great American contends that the loss comprising the majority of Millennium's claim is a mere "bookkeeping loss" as opposed to a loss covered by the Policy. In addition, Great American argues that the part of Millennium's claim representing commissions intended for legitimate third-party travel agencies cannot constitute a loss because these agencies provided an uncompensated service without seeking or recovering payment from Millennium. It argues that a loss connected to these commission payments could occur only upon payments to or demands by the legitimate travel agencies.

Millennium cites *Am. Tooling Ctr., Inc. v. Travelers Cas. and Sur. Co. of Am.*, 895 F.3d 455 (6th Cir. 2018), which applied Michigan law and considered a similarly worded policy.[4] There, the insured subcontracted with a Chinese vendor. *Id.* at 457. A bad actor impersonating this vendor induced the insured to wire it several hundred thousand dollars. *Id.* Upon discovery,

---

[4] The *Am. Tooling* policy covered "direct loss of, or direct loss from damage to, Money, Securities and Other Property directly caused by Computer Fraud." *Id.* at 459 (emphasis deleted).

the insured and the Chinese vendor agreed that the insured would pay 50% of what it owed and payment of the remaining 50% would be contingent on the result of its insurance claim. *Id.* at 458. The Sixth Circuit reversed a grant of summary judgment in favor of the insurance company and granted summary judgment to the insured, holding that the "[the insured] immediately lost its money when it transferred the approximately $834,000 to the impersonator; there was no intervening event." *Id.* at 460 (citation omitted). It also held that "the fact that [the insured] contractually owed that money to [the Chinese vendor] and the two parties later agreed to spread the loss between them *has no bearing on whether this loss was directly suffered by [the insured]*." *Id.* at 461 (emphasis added).

Millennium also relies on *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265 (6th Cir. 2012), a case in which several insured financial institutions sought to recover losses resulting from an employee's fraudulent acts.[5] *Id.* at 267. An employee had stolen money from the brokerage accounts of certain clients of these financial institutions. *Id.* at 268. Upon discovering the loss, one of the financial institutions reimbursed the money stolen and covered the clients' lost interest and unrealized income. *Id.* In determining that the insured had suffered a loss under the policy under Ohio law, the Sixth Circuit explained that "[i]f property qualifies as 'covered property,' and a dishonest employee steals it, the employee 'directly' causes the loss. It is as simple as that . . . ." *Id.* at 270. The court did not suggest that reimbursements of losses to third parties must be made by the insured before it would recognize the existence of a direct loss.

Great American argues otherwise in its reply, stating that *First Defiance* held "that the insured had suffered a 'direct loss' by virtue of reimbursing its defrauded clients because it had a straightforward legal obligation to do so that was not 'contingent on other [sic] things other than

---

[5] The *First Defiance* policy covered "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others." *Id.* at 267.

[the] employee's fraud.'"  (Doc. 22 at PAGEID#: 237) (quoting *First Defiance*, 688 F.3d at 270).

But *First Defiance* did not predicate its finding of a direct loss on the fact of a reimbursement

pursuant to a preexisting legal obligation.  The court cited several cases to illustrate the

difference between direct losses and "losses contingent on things *other than an employee's fraud*

. . . ."  *First Defiance*, 688 F.3d at 270.  In one such example, *Vons Cos., Inc. v. Fed. Ins. Co.*,

212 F.3d 489, 490 (9th Cir. 2000), the grocery chain Vons had an employee in charge of buying

and selling goods on a secondary market.  That employee dealt with Premium, a company that

operated in this secondary market.  *Id.*  Premium relied on investors to fund its operations.  *Id.*

To assuage potential investors, Premium paid the Vons employee to vouch falsely for certain

transactions upon inquiry by the investors, which ballooned into a Ponzi scheme.  *Id.* at 490–91.

Eventually, the investors sued Premium and added Vons as a defendant on the theory that it

negligently supervised its employee.  *Id.* at 491.  Vons settled for $10 million dollars and

submitted a proof of loss to its insurer under an employee dishonesty policy.  *Id.*  at 491.  The

court emphasized that Vons "lost no money" from the original scheme.  *Id.* at 490.  Instead, the

loss arose from "the threat of vicarious liability for [its employee's] tort which caused damage to

third parties."  *Id.* at 491.  Such a loss, contingent on the discovery of the Ponzi scheme and a

third-party lawsuit, was a loss contingent on things other than the employee's fraud and therefore

not direct for purposes of the policy at issue.  *Id.* at 492–93.

Here, as contrasted with *First Defiance*'s illustrations of contingent, uncovered losses,

Millennium alleges that it disbursed the amount of its claim because of Merdis's fraudulent

scheme and not because of any intermediate, third-party action driving its out-of-pocket loss.

Millennium contends that nothing in *First Defiance* suggests that its coverage decision

"necessarily depended on the insured reimbursing its clients for funds its employee stole from them."  (Doc. 22 at PAGEID#: 237).

Great American insists that the portions of the claim representing payments intended for legitimate travel agencies cannot constitute a covered loss, because (1) Millennium received legitimate value for those payments and would therefore receive a windfall if the loss is covered, and (2) the legitimate third-party travel agencies are the ones that truly lose in this scenario.  To explain the first part of its argument, Great American relies on the "bookkeeping loss" theory. The cases that Great American cites, however, lend support to Millennium's argument.

In *F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d 1070 (10th Cir. 1994), the insured bank's employee made an illegal loan.  *Id.* at 1073–74.  Considering policy language very similar to that at issue here,[6] the Court in *United Pac. Ins.* explained that "[b]ookkeeping or theoretical losses, *not accompanied by actual withdrawals of cash* or other such pecuniary loss is not recoverable. . . .  In terms of loss with respect to the making of loans, a bank *suffers a loss when funds are disbursed* due to the employee's wrongful conduct."  *Id.* at 1080 (citations omitted) (emphasis added).  The court upheld a jury verdict in favor of the insured on the basis that the insured had, in fact, disbursed loan proceeds.  *Id.* at 1080.  The fact that there was collateral for the fraudulent loan, i.e., that there was theoretically no loss on the bank's books, did not undermine the finding of an actual loss for purposes of the policy at issue.  *Id.* at 1080–81.  As applied to this case, *United Pac. Ins.* first emphasizes that the actual disbursement of funds is the critical component of an actual loss.  It also suggests that because the theoretically loss-neutralizing factor of collateral did not impact its loss analysis, the theoretically loss-neutralizing factor that the

---

[6] The *United Pac. Ins.* policy covered: "(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others."  *Id.* at 1077.

legitimate travel agencies have not yet demanded reimbursement should not impact the loss analysis in the case here.

Great American also cites *Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*, No. CV305-167, 2007 WL 4973847 (S.D. Ga. Sept. 14, 2007), in which a bank employee embezzled funds by executing fraudulent loans in the names of the bank's customers.[7] *Id.* at *1. The employee had used some fraudulent loans to pay off prior fraudulent notes and had converted others to cash. *Id.* at *1–2. The court deemed only the latter, those loans that "resulted in actual reductions of the cash balance" to the bank, to constitute loss under the policy. *Id.* at *2–4. It distinguished the former as "theoretical or bookkeeping loss." *Id.* at *4.

Great American next cites to *BankInsure, Inc. v. Peoples Bank of the South*, 866 F. Supp. 2d 577 (S.D. Miss. 2012), which also discussed a fidelity bond covering employee fraud.[8] There, the bank had originated a legitimate loan to its customer. *Id.* at 588. A bank employee created fictitious loans to pay off that customer's loan. *Id.* Upon discovery, the bank created a new loan to its customer, which paid off the intervening fictitious loans on its books. *Id.* The court held that there was no disbursement of funds as a result of the fraud and therefore no recoverable loss; the employee "merely shifted money around on the Bank's books . . . ." *Id.* (citation omitted). Like *United Pac. Ins.*, both *St. Paul Mercury* and *BankInsure* underscore that actual disbursement of funds is the critical element in determining an actual loss.

In the same year that the Tenth Circuit decided *United Pac. Ins.*, it distinguished a similar scenario in *In re Ben Kennedy and Assocs., Inc.*, 40 F.3d 318 (10th Cir. 1994). Great American cites this case to support the second part of its argument: that third-party losses are not direct

---

[7] The *St. Paul Mercury* court considered a fidelity bond covering "[l]oss resulting directly from employee dishonesty." *Id.* (internal quotation marks omitted).
[8] The *BankInsure* policy covered "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others." *Id.* at 581.

losses absent some remedial action by the insured. In *Ben Kennedy*, the insured was an insurance agency. *Id.* at 318. Its employee created a sham "specialty" insurance agency and sold policies from this sham agency to the insured's clients. *Id.* The insured billed its clients for these sham policies, deducted the commission, and forwarded the rest to the sham agency. *Id.* at 318–19. Upon discovery of the scheme, the insured reimbursed a defrauded customer and secured valid policies for several others. *Id.* at 319. The insured was forced into bankruptcy, and the bankruptcy trustee sued the insurer to recover *all* the insured's clients' losses (to the extent of the policy[9] limit)—not just those for which the insured had provided a remedy. *Id.* The court noted that the insured "was in possession of, but did not *own*, the money that was lost." *Id.* at 319 (emphasis added). Because the money lost belonged in the first place to the defrauded clients, the *insured's* insurable loss came only when it experienced a financial detriment, i.e., when it reimbursed defrauded clients. *Id.* at 319–20.[10] Here, in contrast, the funds stolen by Merdis were *owned* by Millennium. Upon disbursement of the funds to Merdis, Millennium suffered an insurable loss.

The consensus from the authorities discussed is that a direct loss under the Policy requires an actual disbursement of an insured's funds, and the direct loss occurs immediately upon such disbursement provided that an employee's fraud caused the disbursement (a matter that is uncontested here). Millennium's position is consistent with these authorities and persuasive. Millennium's complaint demonstrates a "loss" under the Policy because it alleges that it disbursed the funds comprising its claim to Merdis as a result of his fraudulent scheme.

---

[9] The *Ben Kennedy* policy covered "losses of money, securities or other property resulting from the fraud or dishonesty of any of [its] employees. This can be money, securities or other property [it] own[s] or that [it is] holding, whether or not [it is] liable for its loss." *Id.*

[10] The Tenth Circuit reasoned that to permit the insured to recover the full policy limits (and not just its out of pocket expense) "without a corresponding financial detriment . . . would amount to allowing an insured to wager on the loss of others' property in its possession, and might foster a temptation for similarly situated insureds to 'lose' such property for economic gain." *Id.* (citation omitted).

The Court finds that the motion to dismiss Count I (Breach of Contract) and Count III (Declaratory Judgment) is not well-taken and should be denied. Given the Court's conclusion above, it does not follow that Millennium's bath faith denial of coverage claim is effectively moot, and the motion to dismiss Count II should also be denied on this basis. (*See* Doc. 18-1 at PAGEID#: 128–29 (arguing that if an insurer's coverage decision is correct, then it cannot have been made in bad faith)).

### C. Does the Policy's limitations clause bar Millennium's claims?

Great American argues that Millennium's complaint is barred by the Policy's limitations clause, which prohibits legal action against it "[u]nless brought within 2 years from the date [Millennium] discover[ed] the loss." (Doc. 1, Ex. A at PAGEID#: 35). Millennium's proof of loss form and claim notification letter (Doc. 18-2 at Exs. A–B) both reflect discovery of the loss in June 2017, but Millennium did not file suit until February of 2020. Millennium counters that it cannot *reasonably* have been expected to file a lawsuit prior to the determination of its claim while it remained under a duty to cooperate with the claim investigation per the Policy. Under "Duties in the Event of Loss[,]" the Policy required Millennium to "[c]ooperate with [Great American] in the investigation and settlement of any claim." (Doc. 1, Ex. A at PAGEID#: 33). The Policy also conditioned legal action against Great American upon "compli[ance] with all the terms of [the] Policy . . . ." (*Id.* at PAGEID#: 35).

Under Ohio law, "an insurance contract may lawfully limit the time within which a suit may be brought on that contract of insurance if the period fixed in the policy is not unreasonable[,]" even when the period for suit is limited to one year. *Hounshell v. Am. States Ins. Co.*, 424 N.E.2d 311, 313 (Ohio 1981) (citation omitted). The Sixth Circuit, applying Ohio law, has rejected the general premise that policy limitations run from the date of accrual (i.e., the

denial of liability). *See Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996) ("contractual limitations provisions in insurance contracts commence the moment that the triggering event occurs, regardless of other policy provisions requiring that certain conditions be fulfilled before the insured has a right to enforce the contract"); *Troutman v. State Farm Fire & Cas. Co.*, 570 F.2d 658, 659 (6th Cir. 1978) (finding the argument that a policy's statute of limitations begins to run from the cause of action's accrual "clearly is not the law of Ohio"). In *Friendly Farms*, the Sixth Circuit enforced a policy limitation even though it expired while the insurer continued to investigate the claim. *Id.* at 545.

The caveat to the general policy of enforcing insurance policy limitations clauses is that limitations on suit must not be unreasonable. *Hounshell*, 424 N.E.2d at 313. This is consistent with Ohio law's general public policy preference that procedural hurdles should not extinguish a valid cause of action before that cause of action accrues. *See, e.g., Forest Hills Local School Dist. Bd. of Edn. v. Huegel*, Nos. CA2007-02-026, CA2007-02-032, 2008 WL 2102406, at *2 (Ohio Ct. App May 19, 2008) ("The Ohio Supreme Court has explicitly acknowledged a public policy interest in preventing the extinguishment of a litigant's right of action before it arises."). *Compare Kraly v. Vannewkirk*, 635 N.E.2d 323 (Ohio 1994) (limitations period in uninsured motorist policy not enforced where the tortfeasor was insured at the time of the accident, but his insurer was later declared insolvent near the expiration of the limitations period) *with Angel v. Reed*, 891 N.E.2d 1179, 1182 (Ohio 2008) (acknowledging the "unique factual situation" presented in *Kraly* and holding that a two-year uninsured/underinsured-motorist policy limitation was reasonable and began running upon the date of the accident involving the uninsured motorist).

Insurance policy limitation periods may be subject to waiver even if otherwise reasonable and enforceable. *Hounshell* held that "a waiver . . . may occur when the insurer, by its acts or declarations, evidences a recognition of liability under the policy, and the evidence reasonably shows that such expressed recognition of liability and offers of settlement have led the insured to delay in bringing an action on the insurance contract." 424 N.E.2d at 314. There need not be evidence than an insurer actively "misled" an insured into forbearance, only that the acts or declarations lead to the forbearance. *Id.* at 313–14. Acts that imply forbearance may suffice. "Ohio appellate courts have found that reasonable minds could differ as to whether [an] insurance company waived the one-year contractual limitations period by not officially denying the claim or by leading the insured to believe that the claim was still viable after the contractual limitations period had expired." *Arp v. Am. Family Ins. Co.*, 932 N.E.2d 968, 974 (Ohio Ct. App. 2010), *cause dismissed*, 931 N.E.2d 1100 (Ohio 2010) (citations omitted). In *Arp*, the court found that payment of certain expenses, notwithstanding its assertions that it was not waiving any rights, constituted a recognition of liability that could support waiver of a policy limitation. *Id.* at 974–75. For waiver to apply, the conduct allegedly supporting waiver "must have occurred within the time limitation contained in the . . . policy, rather than after such limitations have run." *Friendly Farms*, 79 F.3d at 545 (quoting *Metz v. Buckeye Union Fire Ins. Co.*, 147 N.E.2d 119, 121 (Ohio Ct. App. 1957)) (remaining citation omitted).

Millennium first argues that the Policy's limitations clause should not be enforced, relying on public policy and arguing that the Court must consider the interplay between an insurance policy's limitations period and an insured's duty to participate in the claim's investigation in evaluating reasonableness. Great American points to *Kish v. Chubb Grp. of Ins. Cos.* to suggest that Millennium's position is not consistent with Ohio law. No. 4:04 CV 02224,

2005 WL 1683667, at *7 (N.D. Ohio July 19, 2005) ("It is well-settled that participation in an

insurer's investigation of the claim bears little relevance to the application of the suit limitation

clause.").  *Kish* relied on *Broadview Sav. & Loan Co. v. Buckeye Union Ins. Co.*, 434 N.E.2d

1092 (Ohio 1982).  In *Broadview*, the Supreme Court of Ohio enforced a one-year limitation

period notwithstanding the fact that it expired while the insurer "was proceeding to its internal

determination of whether or not to pay the claim under the policy . . . ."  *Id.* at 1094.  It explained

that,

> no settlement offers and actions by or on behalf of the insurance company here
> could have reasonably led the mortgagee . . . to believe that the matter was being
> settled, and that it would be relieved of its contractual responsibility to bring legal
> action within the period set forth in the policy.

*Id.* at 1095.  *Broadview* did not discuss the interplay (if any) between the insurance policy's

limitations period and the insured's duty to participate in the claim's investigation.  But there is

some indication from the Sixth Circuit that this interplay is not relevant under Ohio law:

> What [insured] contended . . . was that the provisions of the insurance contract
> made cooperation in [insurer]'s investigation a condition precedent to the bringing
> of suit, and the length of the investigation rendered it impossible for [insured] to
> meet the condition prior to October of 1991.  The district court did not find this
> contention persuasive, and neither do I.

*Friendly Farms*, 79 F.3d at 546 (Nelson, J., concurring).

   *Kish* also cited *Colvin v. Globe Am. Cas. Co.*, 432 N.E.2d 167, 168 (Ohio 1982),

*overruled on other grounds by Miller v. Progressive Cas. Ins. Co.*, 635 N.E.2d 317 (Ohio 1994),

a case that leaves some room for Millennium's argument that the timing of an insurer's denial

has some bearing on the reasonableness of a policy's limitations clause.  In *Colvin*, the Supreme

Court of Ohio found that an insurance contract's one-year limitations period was lawful, even

though the policy required that the insured "fully compl[y] with all of the terms of the policy[.]"

432 N.E.2d at 168.  But *Colvin* did not make clear that the policy it considered explicitly

required an insured's *cooperation* with the claim investigation and settlement as the Policy does here.  (*See* Doc. 1, Ex. A at PAGEID#: 33).  In addition, in its discussion of the reasonableness of the limitations period at issue, *Colvin* highlighted the fact that the evidence demonstrated that the insured "realized that the insurance company was not acknowledging the viability of the claim" prior to the expiration of the limitations period.  *Id.* at 170.  The court emphasized, "[i]t becomes rather clear that there was a real dispute between the parties sometime prior to [the expiration of the limitations period.]"  *Id.*  Similarly, in *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 710 (6th Cir. 1992), which relied on *Broadview* to find a one-year limitation reasonable, the court highlighted that "[t]here was adequate time [after the insurer's notice of denial] for [the insured] to file suit."[11]

While the Court finds that the Supreme Court of Ohio's decisions on limitations periods in the insurance context are somewhat less "bludgeoning" than *Kish*'s characterization, *see* 2005 WL 1683667 at *5, Ohio courts generally enforce policy limitations periods running from the date of discovery of the claim.  Assuming, then, that the Policy's limitations clause would be enforced, Great American also asks the Court to also conclude as a matter of law that it did not waive enforcement of that clause.

In its complaint, Millennium includes the following allegations related to wavier:

> 29. During the period in which Great American investigated the Claim, Great American's words and conduct indicated and led Millennium to believe that coverage would be extended, that Great American acknowledged liability under the Policy, and that the "loss" would be covered.

> 30. There was no justification for Great American's actions, omissions, and delay.  Great American has long had at its disposal all facts needed to pay the Claim in full.

> . . .

---

[11] Great American indicates in its reply that *Thomas* held that the "insurer did not 'effectively waive[]' [the] limitation clause even though it denied coverage after [the] limitations period had run."  (one set of internal quotation marks omitted) (Doc. 22 at PAGEID#: 243).  This is inaccurate; the insurer in *Thomas* denied coverage approximately one month before the limitations period had run.  *Thomas*, 974 F.2d at 710.

40. Great American's [December 17, 2019] letter acknowledged that its private investigator confirmed that Merdis did indeed "divert" and/or "embezzle" payments of $1,954,329.13 from Millennium, yet proposed to pay less than 20% of the entire Claim.

41. Great American's December 17, 2019 letter did not mention any contractual limitation period, or assert any limitation period as a basis for denying coverage.  Indeed, the letter admits liability and coverage exists, but unfairly and unreasonably refuses to pay the full amount of the loss.  This letter, and Great American's agreement to make partial payments under the Policy, further led Millennium to believe that Great American would not assert, or had waived, any contractual limitation period in the Policy.

. . .

48. Though the January 31, 2020 letter did reference a purported limitation period, it did not do so as a basis for denying liability or coverage.  Indeed, the letter expressly stated that "GAIC is not disputing that Merdis unjustly and criminally enriched himself," and the letter reasserted Great American's offer to pay $379,638.87 under the Claim.  Great American does not and has never asserted that it is not liable whatsoever to Millennium.  Great American to this day has acted in a manner inconsistent with any contractual limitation period that could operate as a defense to liability or coverage.

(Doc. 1 at PAGEID#: 6, 8–9).

Millennium argues that these allegations suffice to raise potential waiver and that dismissal pursuant to the Policy's limitations clause would therefore be premature.  It analogizes its situation to *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459 (6th Cir. 2013), in which the plaintiff sought to equitably toll the limitations period due to fraudulent concealment.  *Id.* at 474–75.  This doctrine requires "that the defendant engaged in a course of conduct to conceal evidence of the alleged wrongdoing, and that the plaintiff, despite the exercise of due diligence, failed to discover the facts supporting the claim."  *Id.* at 475 (citation omitted).  The court concluded that questions of the plaintiff's due diligence were inappropriate for disposition on a motion to dismiss.  *Id.* at 476.

Great American contends that Millennium's waiver allegations are conclusory, making disposition of this issue on a Rule 12(b)(6) motion appropriate.  Great American cites *Allen v. Anderson Windows, Inc.*, 913 F. Supp. 2d 490, 510–511 (S.D. Ohio 2012) and *Walburn v. Lockheed Martin Utility Services, Inc.*, 443 F. App'x 43, 47–49 (6th Cir. 2011) to support its position.  Each case considered the applicability of equitable estoppel.  Unlike the waiver of the

Policy's limitations clause urged here, equitable estoppel under Ohio law requires a more particular finding: a misrepresentation calculated to induce a delay in filing suit. *Allen*, 913 F. Supp. 2d at 511; *Walburn*, 443 F. App'x at 48. In *Allen*, the court found that the plaintiff did not sufficiently plead this particular type of misrepresentation. *Allen*, 913 F. Supp. 2d at 510–11. Likewise, in *Walburn*, the court found dismissal appropriate at the Rule 12(b)(6) stage because "the alleged misrepresentation . . . did not pertain to the limitations period." *Id.* at 49.

Millennium's allegations, quoted above, sufficiently raise a question as to whether Great American took any action, misleading or not, that suggested Millennium's claim would be covered, thereby causing the latter to delay filing suit. Great American ultimately may demonstrate that Millennium's waiver arguments fall short, but the Court is not convinced that it should dismiss them at the pleading stage. *See Lee v. Goodville Mut. Cas. Co.*, No. 1:14cv933, 2016 WL 5661683, at *3 (S.D. Ohio Sept. 30, 2016) ("While Defendants may ultimately prevail at summary judgment on the issue of waiver, the Court will not dismiss the claims at this time."). Because the Court finds that Millennium's complaint sufficiently alleges facts to support a potential waiver of the Policy's limitations clause, Great American's motion to dismiss Counts I and III should be overruled on this basis.

Great American's limitations clause arguments refer to the complaint generally but do not address Count II (Bad Faith Denial of Coverage) specifically. The Court agrees with Millennium that this claim is not subject to the Policy's limitations clause. *See United Dep't Stores Co. No. 1 v. Cont'l Cas. Co.*, 534 N.E.2d 878, 880 (Ohio Ct. App. 1987) ("The tort claim is independent of the contract of insurance and is not subject to the limitation period contained in the policy.") (citing *Plant v. Illinois Emp'rs Ins. of Wausau*, 485 N.E.2d 773, syll., ¶ 3 (Ohio Ct.

App. 1984)).  *See also Klein v. State Farm Fire & Cas.*, 250 F. App'x 150, 156 n.5 (6th Cir.

2007) (same).  Great American's motion to dismiss should be denied as to Count II on this basis.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Defendant's motion to dismiss (Doc. 18) be **DENIED.**

2. Plaintiff's evidentiary objections to Great American's exhibits in support of the

   motion to dismiss (Doc. 21) be **OVERRULED IN PART and SUSTAINED IN**

   **PART.**

Date:  7/29/2020

Karen L. Litkovitz

United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

M&C HOLDINGS DELAWARE,                       Case No. 1:20-cv-121
PARTNERSHIP, et al.,
　　　　　Plaintiffs,                            Dlott, J.
                                             Litkovitz, M.J.

　　　　　　　v.

GREAT AMERICAN INSURANCE
COMPANY,
　　　　　Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140,

155 (1985); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir. 1981).