IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| M&C Holdings Delaware Partnership, *et al.*, | : : | |
| Plaintiffs, | : : | Case No. 1:20-cv-121 |
| v. | : : | Judge Susan J. Dlott |
| Great American Insurance Company, | : : | Order Denying Motion to Compel |
| Defendant. | : : | |

This matter is before the Court on Defendant's Motion to Compel Production of Documents and for *In Camera* Review (Doc. 56). Great American seeks an order compelling Millennium[1] to (i) produce all documents they have withheld solely on the basis of attorney-client privilege that involve communications with non-party Aon Risk Services Northeast, Inc. (along with any affiliates, "Aon") and (ii) submit documents withheld on the basis of attorney-work product privilege for *in-camera* review. Millennium has submitted the documents for *in camera* review, but it argues that the documents are protected by attorney-client privilege and the work-product doctrine. For the reasons that follow, the Court will **DENY** Great American's Motion.

I.     BACKGROUND

A.     **Millennium's Claim for Loss under Insurance Policy**

Millennium operates a chain of hotels throughout the United States. In the ordinary course of its business, Millennium paid commissions to third-party travel agencies in exchange for bookings at its One UN Hotel, located in New York, New York. A Millennium employee,

---

[1] Plaintiffs M&C Holdings Delaware Partnership, M&C Hotel Interests, Inc., M&C Management Services (USA), Inc., CDL Hotels (USA), Inc. and RHM-88, LLC are collectively referred to as "Millennium."

Wayne Merdis, engaged in a fraudulent scheme to siphon off these commission payments from Millennium to fictious travel agencies created by Merdis. He both diverted payments legitimately owed to third-party travel agencies for services those travel agencies rendered, and he accepted payments for services which were not rendered at all. Millennium alleges that both types of commission payments amounted to $1,954,329.13, all of which it transferred to Merdis's fictitious travel agencies as a result of his fraudulent scheme.

Great American had issued Millennium a crime insurance policy ("the Crime Policy") for the period of May 31, 2017 through May 31, 2018. (Doc. 1-1 at PageID 20.) Millennium, through its insurance broker, Aon, notified Great American about the potential loss under the Crime Policy on June 23, 2017. (Doc. 18-2 at PageID 140.) Aon also provided Great American with a Proof of Loss form in the amount of $1,954,329 on August 31, 2018. (*Id.* at PageID 137–138; Doc. 40-2 at PageID 465.) On December 17, 2019, Great American issued a letter to Millennium denying coverage for that portion of Millennium's claim that involved bookings from legitimate travel agents and for part of the bookings from 2001 to 2007 for which Millennium did not document whether legitimate travel agent bookings were involved. (Doc. 18-2 at PageID 151–154.)

**B.     Millennium's Relationship with Aon**

The parties dispute whether the communications that Aon had with Millennium's legal counsel are protected by attorney-client privilege. The parties have provided limited facts regarding the services that Aon provided for Millennium.

Aon agreed in an Engagement Letter dated November 27, 2017 to provide the following services to Millennium related to the Crime Policy and other coverage programs:

Provide claims services as follows:

> • Document insurers' claims services specifications (for marketing and annual carrier service planning purposes).
>
> • Advocate the Client's interests with its insurers as respects claims.
>
> • Assist the Client in settlement discussions with the insurer.
>
> • Work with the Client and/or the Client's claims counsel, as required.
>
> The total number of hours related to [Aon's] claims services described above shall not exceed 20 hours per Annual Service Period. If claims service hours are expected to exceed this amount, [Aon] will discuss a broadened scope of service and additional compensation with the Client.

(Doc. 55-1 at PageID 672.)  Millennium and Aon also agreed that Aon would act as an independent contractor and not an agent of Millennium:

> For all purposes of this Engagement Letter, [Aon] shall be an independent contractor and not an employee or agent of Client, and nothing in the Engagement Letter shall be construed, or deemed to establish any partnership or joint venture between the parties, constitute any party the agent of the other, or authorize any party to make, or enter into, any commitments for or on behalf of any other party.

(*Id.* at PageID 674.)

Millennium and Aon then entered into Engagement Letter Amendment #1, dated January 23, 2019, to specifically address Aon's services to Millennium related to Millennium's insurance claim on the Crime Policy for the losses caused by Merdis's theft.  (Doc. 55-2 at PageID 681.)  Aon agreed to provide the following services in Amendment #1:

> [Aon] Claim Services.  Such services include:
>
> • Facilitate management of claims process with the Client;
>
> • Provide the Client advice and consultation on insurer coverage positions;
>
> • Collaborate with the Client on claim negotiation and resolution strategies;
>
> • Provide support to the Client in claim recovery process.

(*Id.* at PageID 682.)  Additionally, Aon stated its understanding that Millennium did not intend to waive its privileges when it shared its data with Aon:

3

> To the extent that any the Client data includes materials subject to the attorney-client privilege, work product doctrine or other applicable privilege concerning pending or threatened legal proceedings or investigations (the "Applicable Privilege"), We acknowledge that it is the Client's desire, intention and understanding that the sharing of such material is not intended to waive or diminish its continued protection under the Applicable Privilege. Should We become subject to service of process or other lawful demand for disclosure of such data ("Demand for Information"), We will advise the Client of such Demand for Information, to the extent such notice is in itself lawful, permitting the Client, at its own expense, to intervene and object to such disclosure.

(*Id.*) Millennium specifically stated its understanding in Amendment #1 that Aon "is not and is not holding itself out as a public adjuster nor is it providing any legal advice with respect to its activities hereunder" and that Aon would not provide services that "constitute the practice of law." (*Id.* at PageID 861.)

Millennium submitted the Affidavit of Adam Furmansky to further explain the relationship between Millennium and Aon. Furmansky is the Vice President of Aon Risk Services Northeast, Inc. since November 2017. (Doc. 57-1 at PageID 731.) He stated that Aon helped place the Crime Policy with Great American. (*Id.*) He explained the role that Aon played in regard to the claim arising from Merdis's theft:

> 4. Starting in January 2019, Aon was formally engaged to provide claims advocacy services to Millennium regarding the Claim. These services are set forth in an expanded engagement letter that I understand was executed by Millennium and Aon. I was actively involved in all aspects of the Claim.
>
> 5. My understanding was that, during the relevant time period, Millennium lacked a dedicated staff to support complex commercial insurance claims, and did not have any personnel with substantial claims advocacy experience in this context. As part of my advocate role, I was often tasked to be the only person communicating with Great American and its representatives regarding the Claim throughout the year 2019. Accordingly, I (and other members of my staff from Aon) was the only representative for Millennium on a great number of the oral and written communications that occurred with Great American regarding the Claim.
>
> 6. I recall that in or around the May 2019 timeframe, and at least through the date I was informed that Millennium filed a lawsuit in this matter, I observed that Millennium was regularly seeking legal services from its attorneys in connection

with its efforts to recover on the insurance claim. These attorneys included Millennium inside counsel Kristin Prohl and Jonathan Grech, and Millennium outside counsel Daniel Dorfman. During this period, I often participated in communications with each of Ms. Prohl, Mr. Grech, and Mr. Dorfman to assist these lawyers in their efforts to provide legal services to Millennium regarding the insurance claim.

7. Through my participation in these attorney communications, Millennium's attorneys were afforded the benefit of facts that I had in my possession and that others at Millennium did not. Facts exclusive to me included the content of the many oral and written communications between myself and Great American for which no Millennium employee was present, my mental impressions of those communications, my institutional knowledge regarding the facts and circumstances giving rise to the Claim, and my experience in the field of insurance recovery. I also was asked to provide draft language for proposed communications to Great [American] attorneys for their advice, markup, and approval prior to transmitting such communications to the insurer.

8. On or around November 19, 2019, I recall that Millennium's litigation counsel Mr. Dorfman sent a letter to Great American demanding that the insurer provide a coverage letter without further delay. I recall that Mr. Dorfman elicited my knowledge and input to develop the letter. I can confidently state that any communications made with Mr. Dorfman in the days leading up to that letter and afterward were made in anticipation of, and because of, the prospect of litigation with Great American.

9. Based on my own intent in participating in communications with Millennium's attorneys, and my observation of the content of these communications from others, it is my belief that each and every oral and written communication that I and other staff at Aon participated in with Millennium's attorney's was primarily made to help Millennium's internal and outside lawyers render legal advice to and formulate legal strategy for Millennium.

(Doc. 57-1 at PageID 732–733.) Finally, consistent with the Engagement Letter Amendment #1, Furmansky stated that he held in confidence the communications with Millennium's attorneys. (*Id.* at PageID 733.)

C.  **Procedural History**

Millennium filed this suit against Great American in February 2020, more than two years after it provided notice of the loss to Great American, alleging claims for breach of contract, bad faith denial of coverage, and declaratory relief. (Doc. 1.) Great American initially moved to

5

dismiss the Complaint in lieu of filing an answer. (Doc. 18.) This Court issued an Order Denying Dismissal on October 6, 2020. (Doc. 29.) This Court made two key determinations in the Order Denying Dismissal. First, the Court held that Millennium stated a plausible claim that it suffered a loss under the Crime Policy when its funds were disbursed to Merdis or his fictitious travel agencies as commissions for services they had not rendered. (*Id.* at PageID 324–325.) Second, the Court held that Millennium had pleaded sufficient facts to raise a plausible question whether Great American waived enforcement of the two-year limitations period. (*Id.* at PageID 328.)

Thereafter, without a full discovery period, Millennium moved for partial summary judgment. (Doc. 37.) It sought a ruling that "Millennium's claim is covered as a 'loss' under the Policy (i) whether or not payments originally [were] intended for third party agencies, and (ii) whether or not such agencies were ever paid the commissions they were owed." (*Id.* at PageID 392.) The Court granted partial summary judgment to Millennium and concluded as follows:

> [T]he Court holds as a matter of law that Millennium suffered a loss when it disbursed more than $1.9 million in commissions to Merdis or his fictitious travel agencies for bookings they did not make. This holding applies whether or not Millennium also paid commissions to the actual travel agencies that made the bookings from which the commissions were diverted. Accordingly, Millennium is entitled to coverage under the "Employee Dishonesty" provision in Insuring Agreement 1 of the Policy for the claim submitted to Great American.
>
> Given the unusual procedural history of this case, it is important to clarify that the Court's limited holding does not resolve this case. The Court has not addressed herein whether Great American waived enforcement of the two-year limitations period set forth in the Policy. The Court must dismiss this case if Great American is entitled to enforce the limitations period. The issues of bad faith and damages also remain. The parties should proceed to discovery on all remaining issues.

(Doc. 48 at PageID 564.)

The parties then proceeded to discovery. The Court understands that most discovery has

6

been completed. The Court addressed discovery issues with the parties on March 5, 2021, March 28, 2021, and July 27, 2021. The pending dispute concerns whether the attorney-client privilege between Millennium and its counsel is broad enough to cover communications involving Aon, its insurance broker. Great American seeks the communications because the documents might be relevant to the statute of limitations and bad faith issues. Great American asks the Court to both (i) issue an order compelling Millennium to produce all documents withheld solely on the basis of attorney-client privilege that involve communications with Aon and (ii) review documents *in camera* that have been withheld on the basis of the work-product doctrine to determine if they should be produced. Millennium opposes producing the documents to Great American in discovery, but it has filed a privilege log and submitted the withheld documents for *in-camera* review.

## II.     ANALYSIS

The Sixth Circuit has identified the elements of the attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [insistence] permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355–356 (6th Cir. 1998); *see also State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St. 3d 261, 824 N.E.2d 990, 995, 2005-Ohio-1508 (2005) (same).[2] The privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal

---

[2] "There is no material difference between Ohio's attorney-client privilege and the federal attorney-client privilege." *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-CV-708, 2020 WL 5014914, at *7 (S.D. Ohio Aug. 25, 2020); *see also MA Equip. Leasing I, L.L.C. v. Tilton*, 980 N.E.2d 1072, 1079–1080, 2012-Ohio-4668 (2012) (same).

quotation and citation omitted). The Supreme Court has stated that the privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). Courts apply the privilege "only when 'necessary to achieve its purpose' and only to protect legal disclosures that 'might not have been made absent the privilege.'" *Cooey v. Strickland*, 269 F.R.D. 643, 648 (S.D. Ohio 2010) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

This dispute centers on whether the presence of Aon representatives, primarily Adam Furmansky, has the effect of negating attorney-client privilege between Millennium and its counsel. Attorney-client privilege does not apply, or is considered to be waived, in most instances where communications are made in the presence of third parties. *See Reed*, 134 F.3d at 357 ("[A]ttorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party."). Millennium argues that communications among itself, Aon, and its counsel are protected under the privilege by the necessary intermediary doctrine. "In considering whether a client's communication with his or her lawyer through an agent is privileged under the intermediary doctrine, the critical factor is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Robinson*, 5 F. Supp. 3d 933, 938 (S.D. Ohio 2014) (cleaned up); *see also John Labatt Ltd. v. Molson Breweries*, 898 F. Supp. 471, 473 (E.D. Mich. 1995) (recognizing privilege for "communications between a client or a client's representative and a lawyer or the lawyer's representative as long as the other conditions for attorney-client privilege are fulfilled").

Both parties cite to the seminal case from the Second Circuit Court of Appeals in which

8

the court found that the presence of a tax accountant employed by a law firm at a meeting between the attorneys of the law firm and their client did not void the attorney-client privilege. *United States v. Kovel*, 296 F.2d 918, 921–922 (2d Cir. 1961). The court analogized the accountant to an interpreter needed to translate a foreign language for an attorney:

> Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist . . .; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.

*Id.* at 922.[3]

Nonetheless, the Second Circuit reached a different conclusion about a different accountant in *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). In *Ackert*, the Second Circuit held that the communications between the client's accountant and the client's attorney were not privileged even if the attorney had sought details about a proposed investment from the accountant in order to advise his client. *Id.* The court appeared to narrow the holding of *Kovel* by stating that that the inclusion of a third-party in communications between a client and its attorney voids the privilege unless "the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." *Id.* It held that the accountant in *Ackert* was not acting "as a translator or interpreter[,]" and thus it was not protected by the attorney-client privilege. Not surprisingly, Great American argues that Aon's communications with Millennium's counsel are not protected under *Kovel* and *Ackert* because the broker was not acting as a translator or interpreter.

In further support, Great American cites to *Cellco Ptshp v. Certain Underwriters at*

---

[3] Some cases have limited *Kovel* to apply to situations where the attorneys retained an accountant or other professional to help them render legal advice, and not to situations where the third-party intermediary was retained by the client. *See e.g.*, *In re Myers*, No. 11-61426, 2013 WL 4067126, at * 4 (N.D. Ohio Bankr. Aug. 8, 2013).

9

*Lloyd's London*, No. 05-3158 (SRC), 2006 WL 1320067 (D.N.J. May 12, 2006). The *Cellco* court held that communications between the plaintiff's counsel and Aon, the plaintiff's insurance broker, were not protected despite the fact Aon provided information to plaintiff's counsel that was helpful to counsel's representation of plaintiff. *Id.* at *4. The court cited *Ackert* for the proposition that "conversations between counsel and a tax specialist, retained to help counsel understand the consequences of a pending client action, did not serve a specialized purpose in facilitating the attorney-client relationship" and, therefore, were not protected. *Id.* at *3 (citing 169 F.3d at 139). It distinguished *Kovel* stating that the accountant in that case was an "interpreter." *Id.* The *Cellco* court suggested that the communications with Aon would have been privileged only if the plaintiff had proven that the presence of Aon had been "essential to and in furtherance of the communication" or had "serve[d] a specialized purpose in facilitating the attorney-client relationship" with the plaintiff. *Id.* at *3–4.[4]

Not all courts have restricted the intermediary doctrine as much as *Ackert* and *Cellco*. Some courts have protected as privileged communications between plaintiff's counsel and plaintiff's insurance broker or agent made for purpose of forming legal strategy. *See*, *e.g.*, *SavaSeniorCare, LLC v. Starr Indemnity and Liability Co.*, No. 1:18-cv-1991-SDG, 2019 WL 9806574, at *10 (N.D. Ga. Oct. 31, 2019), *report and recommendation adopted by*, 2019 WL 9809629 (N.D. Ga. Dec. 23, 2019); *Coca-Cola Co. v. Allainz Ins. Co.*, No. 1:01-cv-3125-RWS,

---

[4] Other cases cited by Great American are inapposite. The court in *Cardinal Aluminum Co. v. Cont'l Cas. Co.*, No. 3:14-CV-857-TBR-LLK, 2015 WL 4483991, at *3 (W.D. Ky. July 22, 2015), held that attorney-client privilege did not apply to communications between an insured and its broker. There is no suggestion in the case that any of the broker's communications were with the insured's attorney for the purpose of obtaining legal advice for the insured. In *Mt. McKinley Ins. Co. v. Corning Inc.*, No. 602454/2002, 2017 WL 1401363 (N.Y. Sup. Ct. Apr. 17, 2017), the insured did not "set forth any allegation that [the broker] was necessary to fulfill a function that [the insured] was incapable of handling, that [the broker's] services were substantially for the purposes of obtaining legal advice—and not simply for insurance-brokerage services—or that [the broker] uniquely possessed information that [the insured] did not have." *Id.* at *9. As explained in the Analysis *infra*, Millennium has offered evidence that Aon's communications were for the purpose of obtaining legal advice for Millennium and that Aon had knowledge that Millennium lacked.

10

2004 WL 7308665, at *5 (N.D. Ga. Mar. 3, 2004); *Home Depot U.S.A., Inc. v. G&S Investors/Willow Park, L.P.*, No. 1:01-cv-1119-WBH, 2001 WL 37121340, at *3 (N.D. Ga. Sept. 9, 2001); *Miller v. Haulmark Trans. Syss.*, No. 83-103, 104 F.R.D. 442, 445 (E.D. Pa. 1984).[5]

The purpose of the communication with the third-party broker or agent must be to assist the attorney in providing legal services to the client in order for the attorney-client privilege to apply. *See Coca-Cola*, 2004 WL 7308665, at *5 ("to assist counsel in providing legal advice"); *Home Depot*, 2001 WL 37121340, at *3 ("for the purpose of forming legal strategies"); *Miller*, 104 F.R.D. at 445 ("to assist the attorney in providing legal services"); *cf. SavaSeniorCare*, 2019 WL 9806574, at *10 (noting that "the communications all related to the coverage dispute" and were not "ordinary business communications"). The court in the *Coca-Cola* case found two other factors to be significant: (1) the broker who attended meeting between the insured and its attorney was the broker who placed the policy in dispute, so she had "particular knowledge and expertise;" and (2) the insured was aware of the possibility of litigation at the time of the meeting. 2004 WL 7308665 at *4–5. Similarly, in *Miller*, the insurance agent involved in the communications was the agent who placed the policy and had knowledge of the scope of the insurance coverage. 104 F.R.D. at 445. In *SavaSeniorCare*, the district court credited the affidavit of the plaintiff insured's vice president and legal counsel who described the role that its broker played as follows:

> Aon is the insurance broker that placed the Policy and communicated with Starr regarding payment at the outset of the Qui Tam Claim[.] Aon played an important and necessary role in assisting Sava's internal and external counsel in the rendering of legal advice concerning the Qui Tam Claim and Sava's current coverage dispute with Starr.

2019 WL 9806574, at *10 (concluding that the communications between the broker and the insured's counsel were protected by both insurance-client privilege and the work-product

---

[5] The three Northern District of Georgia cases were decided by different judges.

11

privilege). Finally, other courts have held more broadly that brokers are considered to be "insiders" with the insured parties for purposes of the insured party's attorney-client privilege. *See Smith & Nephew, Inc. v. New Hampshire Ins. Co.*, No. 04-3027, 2008 WL 11464785, at *4 (W.D. Tenn. Oct. 6, 2008) ("Because Plaintiff asserts that its brokers played a central role in advising Smith & Nephew with respect to coverage and dealings with insurers, the Court finds that the brokers will be treated as 'insiders' for matters of attorney-client privilege."); *Royal Surplus Lines Ins. v. Sofamor Danek Group*, 190 F.R.D. 463, 470–471 (W.D. Tenn. Aug. 5, 1999) (treating the broker as an "insider" for purposes of the attorney-client privilege).

The Court finds these latter set of cases to be both analogous to the facts at hand and more persuasive than *Cellco* and *Ackert*. Furmanksy, the Aon Vice President, averred that Aon helped place the Crime Policy. (Doc. 57-1 at PageID 731.) He stated that from January 2019 onward, Aon was "formally engaged to play claims advocacy services to Millennium regarding the Claim" because "Millennium lacked a dedicated staff to support complex commercial insurance claims." (*Id.* at PageID 732.) From May 2019 forward that he engaged in communications with Millennium's counsel "to assist . . . in their efforts to provide legal services to Millennium regarding the insurance claim." (*Id.*) He asserted that he knew facts not known by others at Millennium including "the content of the many oral and written communications between myself and Great American . . . , my mental impressions of those communications, my institutional knowledge regarding the facts and circumstances giving rise to the Claim, and my experience in the field of insurance recovery." (*Id.* at PageID 732–733.)

These facts suggest that Aon played a similar role assisting Millennium during its claim dispute with Great American to the brokers in the latter set of cases, including *Coca-Cola* and *SavaSeniorCare*. The majority of withheld documents were created after Aon and Millennium

entered into the Engagement Letter Amendment #1 for the purpose of assisting with the Merdis insurance claim under the Crime Policy. Furmansky and Aon had particular knowledge and expertise about the Crime Policy because Aon placed the Crime Policy and because Aon directly facilitated communications with Great American about the claim. Moreover, Great American has provided no basis to challenge Furmansky's assertion that he held communications with Millennium's counsel in strict confidence as was required in Engagement Letter Amendment #1. Finally, having reviewed the withheld documents *in camera*, the Court is satisfied that the communications among Aon, Millennium, and Millennium's counsel were made to assist counsel in providing legal advice and strategy to Millennium.[6] The facts fit within the intermediary doctrine because the presence of Aon in the communication was "necessary, or at least highly useful" to the rendering of legal advice. *Kovel,* 296 F.2d at 922; *see also*, *e.g.*, *Coca-Cola*, 2004 WL 730865, at *5 (finding the communication privileged because the broker assisted counsel in providing legal advice). To the extent the District Court of New Jersey in *Cellco* required that an intermediary be acting almost as a translator or interpreter to fall within the attorney-client privilege, this Court respectfully disagrees. The Court concludes that the documents that have been withheld by Millennium are protected from disclosure on the basis of attorney-client privilege.[7]

The Court, likewise, concludes that the subset of documents also withheld under the alternative theory of the work-product doctrine are shielded from disclosure by that doctrine as well. "While the attorney-client privilege protects only confidential communications, the work

---

[6] The Court did not read the hundreds of pages of documents submitted for *in camera* review page-by-page or line-by-line. The Court did assure itself that the communications involved Millennium's attorneys and were being made for the purpose of rendering legal advice.

[7] Because the Court concludes that the attorney-client privilege applies under the intermediary doctrine, the Court need not determine whether it also applies on the basis of that Aon was the functional equivalent of a Millennium employee.

product doctrine generally protects from disclosure documents prepared by or for an attorney in anticipation of litigation." *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 713 (6th Cir. 2006).  The Federal Rules of Civil Procedure limit discovery of work product as follows:

> (A) *Documents and Tangible Things*.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:
>
>> (i) they are otherwise discoverable under Rule 26(b)(1); and
>>
>> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*.  If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3).  To determine whether a document is protected because it was made in anticipation of litigation, the Court must consider: "(1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009).

Great American has urged the Court to check whether the documents withheld under work-product doctrine were, in fact, created in anticipation of litigation.  The Court has reviewed each set of documents withheld under the work-product doctrine.  Many of the documents reflect the mental impressions or conclusions of Millennium, its counsel, or Aon.  All appear to have been created in anticipation of likely litigation, as opposed to for general business purposes.  The Court agrees with Millennium that these documents also can be withheld under the work-product doctrine.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Production of Documents and for *In Camera* Review (Doc. 56) is **DENIED**. The Motion is **DENIED AS MOOT** insofar as Millennium already provided the withheld documents for *in camera* review, and **DENIED** insofar as the Court will not order Millennium to produce the documents to Great American in discovery.

**IT IS SO ORDERED**.

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge